REVISED JANUARY 13, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-50575
_____

Ysleta Del Sur Pueblo,
                              Plaintiff-Appellee,

v.

David Laney; Robert L. Nichols;
Anne S. Wynne; Eddie Sanchez; and Rudy Lugo,
                              Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

January 10, 2000

Before KING, Chief Judge, REYNALDO G. GARZA, and EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

BACKGROUND

Ysleta Del Sur Pueblo (the "Tribe" or the "Pueblo"), a federally recognized Indian Tribe, filed suit in federal district court, seeking to eject David M. Laney, Robert L. Nichols, Anne S. Wynne, Eddie Sanchez, and Rudy Lugo, present commissioners of the Texas Transportation Commission, and two employees of the Texas Department of Transportation, in their individual capacities ("Appellants"), from a piece of real property (the "Property") which currently serves as a highway maintenance facility in El Paso County, Texas. The tribe also requested that the

Appellants remove their equipment and "all hazardous and environmentally damaging material" from the Property.  The Pueblo alleges that the Appellants are trespassing in violation of federal law.

The Pueblo is an indigenous Native American Tribe that was originally situated in Isleta [anglicized spelling], New Mexico, where from time to time it received population accretions from the Pueblos of Abu, Quari, and Grand Quivara.[1]  In 1680, during the Pueblo Revolt, a portion of the Pueblo migrated south with retreating Spaniards and occupied camps in the present day El Paso vicinity.  In 1682, Spanish Governor Otermin attempted to reconquer New Mexico, attacking the Isleta Pueblo, reducing it to his control and relocating it to the El Paso area with the Pueblo members who had fled New Mexico in 1680.  In 1682, the Pueblo was situated at its present site in what is now El Paso County, Texas.

In 1751, the Governor of New Mexico granted land, including the Property, to the Pueblo. Neither its legal title nor aboriginal right to the Property was ever terminated by the Kingdom of Spain, the Republic of Mexico, or the Republic of Texas, the successive governments claiming sovereignty over the area including the Property prior to the United States.[2]  In 1845, Texas was admitted to the Union, sparking the Mexican-American War, which ending in 1848 with the signing of the Treaty of Guadalupe Hidalgo.  Article VIII of the treaty guaranteed the protection of the title held by Mexican citizens to land in the United States, and members of the Tribe were,

---

[1]  In summarizing the factual background of this case, we have relied, in large part, upon the Tribe's First Amended Complaint, filed November 25, 1997.  The facts alleged in the First Amended Complaint, as they pertain to the historical origins of the Pueblo and relationship to the Property, remain undisputed.

[2]  According to the Complaint, the Republic of Texas claimed land including the Property but never exercised government control over it.

at the time the treaty was signed, Mexican citizens.

The Pueblo contends that between 1846 and 1850, the federal government acknowledged the Tribe's interest in its lands. Nonetheless, the State of Texas (the "State"), evidently claiming or believing it held title, relinquished the Tribe's land, including the Property, to a municipality. The Property was at some later time conveyed back to the State, and the State is the current title holder of record. The Pueblo argues that the State's action violated the Trade and Intercourse Act, referred to as the Indian Nonintercourse Act (the "NIA").[3] It claims that because of the violation of the NIA, the State's relinquishment of the Property and all subsequent conveyances are null and void, making Appellants' continued occupation of the Property illegal.

Appellants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). In the motion, they asserted that the suit is barred by the Eleventh Amendment to the United States Constitution.[4] In an order entered January 26, 1999, the district court denied the motion after

---

[3] Congress enacted the NIA in 1790. The Act was amended and repassed in 1793, 1796, 1799, 1802, and 1834. It is now codified at 25 U.S.C. § 177 and provides:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

[4] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another States, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. In addition, in *Hans v. Louisiana*, 134 U.S.

concluding that "Congress clearly intended to abrogate the States' Eleventh Amendment immunity when it enacted the Nonintercourse Act and Congress has the power to do so under the Indian Commerce Clause."[5]

ANALYSIS

I.

This court has jurisdiction, under the collateral order doctrine, to entertain an appeal of the denial of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss based upon a claim of Eleventh Amendment sovereign immunity. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993). We review "Eleventh Amendment immunity determinations, like other questions of subject matter jurisdiction, de novo as a question of law." *United States v. Texas Tech Univ.*, 171 F.3d 279, 288 (5th Cir. 1999).

II.

We hold that the State of Texas enjoys immunity, under the Eleventh Amendment, from a suit instituted by an Indian Pueblo alleging a cause of action arising under the NIA, 25 U.S.C. § 177. The Eleventh Amendment constitutes an important limitation on federal authority to review allegedly illegal or unconstitutional actions of state governments and their officers. And yet, our federal system requires that we protect state autonomy while promoting state compliance with federal law. Consequently, several methods of circumventing the Eleventh Amendment's

---

1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court broadened the States' Eleventh Amendment immunity in federal courts and interpreted the Amendment to allow States immunity from federal suits by their own citizens.

[5] "The Congress shall have the Power . . . To regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes; . . . ." U.S. Const. Art. I, § 8, cl. 3.

prohibition against suing states in federal court have arisen. Under the Eleventh Amendment, a state enjoys immunity from a suit instituted in a federal court by an Indian tribe,[6] unless the state expressly waives its sovereign immunity,[7] its immunity is properly abrogated by Congress,[8] or the suit "falls within the exception . . . recognized for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities."[9] The Eleventh Amendment's applicability to this case turns on whether this is a suit against the State, and if so, whether Congress validly abrogated state sovereign immunity in the NIA or whether the Pueblo may proceed under the doctrine of *Ex parte Young*.[10] We hold that this is a suit against the State, that Congress did not abrogate state sovereign immunity in the NIA, and that the Pueblo may not proceed under the *Ex parte Young* doctrine.

III.

First, before we analyze the issue of congressional abrogation of state immunity, we must determine whether the instant suit is one against the State. Often, suits stating a cause of action

---

[6] Eleventh Amendment immunity is effective against Indian tribes and their members. *See Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 268-269 (1997).

[7] *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 119 S.Ct. 2219, 2226 (1999) (holding that a state cannot impliedly waive sovereign immunity). *College Savings* had not been decided at the time the parties submitted their briefs; however, neither argued that the state impliedly waived its sovereign immunity. It is clear in this case that the State has not expressly waived its sovereign immunity.

[8] *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996).

[9] *Coeur d'Alene*, 521 U.S. at 269 (discussing exceptions first recognized in *Ex parte Young*, 209 U.S. 123 (1908)).

[10] *Ex parte Young*, 209 U.S. 123 (1908) (holding that the Eleventh Amendment does not bar suits against state officers to enjoin violations of federal law).

under a particular statute name both the state and state officials, in their individual capacities.

Under those circumstances, a plaintiff mounts an attack against the state by arguing that the

statute at issue abrogates sovereign immunity. If the court finds valid abrogation, both

prospective and retroactive relief are available against the state. If however, the particular statute

has not properly abrogated state sovereign immunity, the plaintiff may nevertheless challenge the

action of the state officials under the *Ex parte Young* doctrine, for prospective relief. *See, e.g.,*

*Seminole Tribe v. Florida*, 517 U.S. 44, 47 (1996) (unsuccessfully arguing both abrogation

against the state and the doctrine of *Ex parte Young* against a state official).

In the instant case, the Pueblo has not expressly named the State of Texas or one of its

agencies as a defendant, but rather only certain state officials. In *Pennhurst State School &*

*Hospital v. Halderman*, 465 U.S. 89 (1984), the Supreme Court examined whether a suit against

state officials, alleging a violation of state law and seeking prospective relief, could be maintained

under the doctrine of *Ex parte Young*. In deciding that it could not, the Court discussed whether

the suit was actually against the State:

> There may be a question, however, whether a particular suit in fact is a suit against
> the State . . . .
> When the suit is brought only against state officials, a question arises as to
> whether that suit is a suit against the State itself. Although prior decisions of this Court have not
> been entirely consistent on this issue, certain principles are well established. The Eleventh
> Amendment bars a suit against state officials when the state is the real, substantial party in
> interest. Thus, [t]he general rule is that relief sought nominally against an officer is in fact
> against the sovereign if the decree would operate against the latter. . .
> The Court has recognized an important exception to this general rule: a suit
> challenging the constitutionality of a state officials's action is *not one against the State*.
> This was the holding of *Ex parte Young* . . . .

*Id*. at 101-102 (footnote, citations, and internal quotation marks omitted and emphasis added).

The Court explained in a footnote: "The general rule is that a suit is against the sovereign if the

judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* at 101 n.11.

For purposes of addressing congressional abrogation of immunity, we recognize that the State is the true party of interest in this case, although it has not been expressly named as a defendant. The State is the real party of interest because the State holds record title to the Property, utilizes the Property as a maintenance facility, and the Pueblo is attempting to persuade us to declare that title null and void. For purposes of deciding whether the *Ex parte Young* doctrine is applicable in the instant case, we acknowledge that the state officials are named in their individual capacities. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) (letting stand a lower court decision granting prospective relief and addressing abrogation for purposes of retrospective relief in a case naming only state officials as defendants). As the Court stated in *Idaho v. Coeur d'Alene*, 521 U.S. 261, 270 (1997), "The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleadings."

IV.

Having determined that this is a suit against the State, we now address the question of whether Congress validly abrogated state sovereign immunity in the NIA. We hold that Congress has not. To validly abrogate state sovereign immunity, Congress must "'unequivocally express . . .its intent to abrogate the immunity,' . . . and second, . . . [it must act] 'pursuant to a valid exercise of power.'" *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Sav. Bank*, 119 S.Ct. 2199, 2205 (quoting *Seminole Tribe*, 517 U.S. at 55).

Appellants argue that, under *Seminole Tribe*, Congress' intent to abrogate state sovereign

immunity must be unmistakably clear in the statute. The NIA, they argue is silent as to abrogation.[11] The Pueblo relies primarily on *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226 (1984) ("*Oneida II*"), in arguing that the NIA provides a clear statement of Congress' intent to abrogate state sovereign immunity. First, the Pueblo asserts that federal law applies to transactions in Indian land. The NIA, it argues, invalidates unauthorized transactions and imposes sanctions on violators. The NIA, it maintains, was intended to apply to both individuals and the states, and Congress' original intent in passing the NIA was to provide a federal forum for the adjudication of Indian concerns. The Pueblo concludes, therefore, that the NIA contemplates state liability in federal courts and is a clear statement of Congress' intent to abrogate states' sovereign immunity.

Appellants respond that the Tribe's reliance on *Oneida II* is misplaced. *Oneida II*, they argue, dealt with whether the NIA provides tribes a private cause of action, not with whether the statute waives sovereign immunity. The State of New York, they point out, was not even a party to the suit.

Contrary to the Tribe's assertion, *Oneida II* does not imply a private cause of action for

---

[11]    Indeed, Appellants argue that the NIA is not applicable to the states at all, presumably even in a suit by the United States. The 1790 version of the NIA provided that "no sale of lands made by any . . . tribe . . . shall be valid to any person or persons, or to any state . . . ."

Subsequent versions deleted the reference to person, persons, and states. The current version of the act provides that "[n]o purchase, . . .shall be of any validity in law or equity . . . ." Appellants assert that this change in language evinces Congress' intent to exclude the states from application of the statute altogether. Appellants' argument is without merit. See *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667 (1974) (*Oneida I*) (citing the current NIA for the proposition that the invalidity of the sale of Indian lands absent federal consent to, inter alia, states "has remained the policy of the United States to this day").

Indians under the NIA.  Indeed, the Supreme Court specifically declined to reach that issue.[12]  The text of the statute does appear, however, to apply to the states in its invalidation of *any* unauthorized transaction.  Even assuming an implied private cause of action, however, the Tribe makes a fatal logical leap by concluding that a congressional intent to abrogate state sovereign immunity flows from the fact that an implied private cause of action exists under a statute applicable to states and private individuals.  The leap is especially large considering the historical relationship between the United States and the Indians.[13]  The statute could easily be determined to provide tribes an implied private cause of action against any party other than a state while reserving for the United States a cause of action as fiduciary against any party, including a state. *Seminole Tribe* provides that:

> Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement . . . [A] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment . . .Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.

517 U.S. at 55-56 (internal citations and quotation marks omitted).  The statute, on its face, does not provide an unmistakably clear intent to abrogate state sovereign immunity.  Nor does the

---

[12]    Oneida II dealt with the 1893 version of the NIA.  In that case, the Supreme Court remarked:

> [Both lower courts found] that the Oneidas had the right to sue on two theories: first, a common-law right of action for unlawful possession; and second, an implied statutory cause of action under the Nonintercourse Act of 1793.  We need not reach        the latter question as we think the Indians' common-law right to sue is firmly        established.

47 U.S. at 233.

[13]  *See, e.g., Montana v. United States,* 450 U.S. 544 (1981) (adjudicating a case brought by the United States in its own right and as a fiduciary for an Indian tribe).

Tribe point to any statement by Congress in the 200 years since the NIA's initial passage indicating an intent to abrogate state sovereign immunity. Congress certainly could have amended the statute following the passage of the Eleventh Amendment to include a clear statement of abrogation if it had so desired, but it never did.

V.

In *Seminole Tribe*, the Supreme Court overruled its holding in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), that Congress can rely on its Commerce Clause power to abrogate state sovereign immunity. In doing so, the Court stated, "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, 517 U.S. at 72-73. Any argument that this statement was dicta and that the holding applied only to the Commerce Clause power was put to rest in *Florida Prepaid*. There, the Supreme Court stated, "*Seminole Tribe* makes clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers . . . ." *Florida Prepaid*, 119 S.Ct. at 2205. The Tribe's argument, therefore, that abrogation is justified by Congress' War Powers is misplaced.

Equally misplaced is the Tribe's reliance on Congress' power in Section 5 of the 14th Amendment. The NIA was originally passed in 1790; the second NIA was passed in 1793, and the language of that act was carried forward in several future acts concluding with an act in 1834. *See Oneida I*, 414 U.S. at 668 n.4. The Eleventh Amendment was ratified in 1798. In any event, the alleged violation was a violation of the 1834 NIA. The Fourteenth Amendment was not ratified until 1868.

It is nonsensical to rely on the Fourteenth Amendment to justify abrogation under a statute

passed before its ratification. The Pueblo cites no authority for the proposition that Congress, in passing the NIA, could abrogate state sovereign immunity under a power not yet granted to it.

VI.

The district court did not address whether this suit may proceed under the *Ex parte Young* doctrine. However, as we now find that the district court erred with respect to abrogation, it becomes necessary to decide if the Pueblo may proceed with its suit against the state officials under *Ex parte Young*. Generally speaking, the Eleventh Amendment allows suits against state officers, however, whether a state officer may be sued depends, largely, on the claim presented and the nature of the relief sought.

Appellants argue that this is an action to quiet title, citing *Idaho v. Coeur d'Alene*, 521 U.S. 261 (1997), for the proposition that quiet title actions against states cannot be adjudicated in federal courts. In *Coeur d'Alene*, a tribe sought to quiet title to the submerged land and beds of Lake Coeur d'Alene and various surrounding waterways. *See id*. at 254. A plurality of the Court held that the *Ex parte Young* doctrine was inapplicable to the case. *Id*. The Tribe asserts that the State's title is null and void and that it has superior title, seeking to eject the state officials from the property.

Moreover, Appellants argue, the Tribe's assertion that the relief it seeks is merely prospective has been rejected in *John G. And Marie Stella Kenedy Memorial Foundation v. Mauro*, 21 F.3d 667 (5th Cir. 1994). In that case, the Foundation asserted ownership over certain land in the possession of the state of Texas.[14] Appellants cite this case for the proposition that an

---

[14] It appears from the opinion that the land, which was sometimes covered by the Laguna Madre, may have been characterized as submerged lands.

action to put a plaintiff in possession of real property held by the state is a quiet title action forbidden by the Eleventh Amendment, and that ordering the state to relinquish property was the equivalent of recovering damages against the state. This court held that the plaintiff's complaint was an action to quiet title, stating that a federal court "does not have the power to adjudicate the State's interest in property without the State's consent." *Id.*

Appellants distinguish the instant case from *Florida Dep't of State v. Treasure Salvors*, 458 U.S. 670 (1982). There, the Supreme Court held that the state had no colorable claim to title in the disputed personal property. Here, Appellants urge, as was the case in *Mauro*, the State has a colorable claim to title.

The Pueblo relies on *Coeur d'Alene*, arguing that in that case the Supreme Court reaffirmed the doctrine of *Ex parte Young*. The Tribe maintains that the Supreme Court declined to apply the *Ex parte Young* doctrine in *Coeur d'Alene* because of the particular relief sought -- a quiet title action seeking to divest the state of any regulatory power over the disputed property -- and the type of real property at issue, submerged lands. According to the Pueblo, Justice O'Connor's concurrence makes clear that in cases involving ordinary land, a distinction can be made between possession and title. Here, as in *United States v. Lee*, 106 U.S. 196 (1882), and *Tindal v. Wesley*, 167 U.S. 204 (1897), the Tribe argues, regular land is involved, and a distinction can be made between possession and title. That is, according to the Tribe, *Coeur d'Alene* vitiates *Mauro*.

Appellants respond that Texas has special interests equal to those of Idaho in *Coeur d'Alene*. The land at issue here is located in a highly developed area, used for highway construction, maintenance and operation, and has many improvement that help facilitate the

purposes which it serves. According to the Appellants, the State will be unable to properly carry out its sovereign responsibilities with regards to state roadways if it loses possession of the property. Appellants note that this case should not be viewed any differently than a case where plaintiffs seek to take possession of land upon which a state highway has been constructed.

In *Coeur d'Alene*, Justice O'Connor's concurrence sets forth the controlling test with regard to *Ex parte Young* as whether "a plaintiff alleges an ongoing violation of federal law, and [whether] the relief sought is prospective rather than retrospective." *Id*. at 294. Justice O'Connor observed, however, two important distinctions between this case and a normal *Ex parte Young* action: this was an action to quiet title, and the tribe sought to divest the state of all regulatory power.

Justice O'Connor distinguished *United States v. Lee* and *Tindal v. Wesley* on the grounds that, in those cases, possession could be distinguished from title. "A court could find that the officials had no right to remain in possession, thus conveying all the incidents of ownership to the plaintiff, without formally divesting the state of its title." *Id*. at 290. Justice O'Connor argued that in the case before the Court, the state would lose all regulatory power over the property.[15]

There are two main problems with the Tribe's arguments. First, the Tribe has not sufficiently distinguished its own case from a quiet title action, and second, *Coeur d'Alene* did not vitiate *Mauro*. The Tribe asserts in its First Amended Complaint that "The Pueblo retains legal

---

[15]  Justice O'Connor states:

"Whatever distinction can be drawn between possession and ownership of real property in other contexts, it is not possible to make such a distinction for submerged       lands . . . In my view, because a ruling in the Tribe's favor, in practical effect,       would be indistinguishable from an order granting the Tribe title to submerged lands,       they *Young* exception to the Eleventh Amendment's bar is not properly invoked       here." Id. at 291.

title to all lands described in the Relinquishment Acts, as well as the right to possess those lands over which it exercised aboriginal possession on December 29, 1845." By seeking to eject Appellants, the Tribe is asking this court to determine that the State has no title to the Property because title rests in the Pueblo. Additionally, the Tribes's argument that the State will retain sufficient regulatory control over the Property rings hollow. A judgment for the Tribe will significantly alter the State's regulatory control over the Property because the Property will be considered part of an Indian reservation under federal control. Moreover, the State here, unlike Florida in *Treasure Salvors*, has a colorable claim to title: the Tribe was not federally recognized until the 1900's, so there is a question whether it would have even retained legal title to land held by it when Texas became a state.

Justice O'Connor's concurring opinion in *Coeur d'Alene* deals specifically with submerged lands and avoids the topic of other pieces of real property. Also, there is no rationale for denial of *Ex parte Young* treatment in that case that represents the views of a majority of the Court. The Tribe therefore incorrectly relies on a statement in Justice O'Connor's concurrence to declare *Mauro*, a case involving real property in another context, vitiated. Justice O'Connor set other contexts aside when she stated, "Whatever distinction can be drawn between possession and ownership of real property in other contexts, . . . ." *Coeur d'Alene*, 521 U.S. at 291. *Mauro* controls and the Tribe's attempt to fit this case within the doctrine of *Ex parte Young* must fail.

CONCLUSION

We hold that the State of Texas enjoys immunity, under the Eleventh Amendment, from a suit instituted by an Indian pueblo alleging a cause of action arising under the NIA. Accordingly, we find that the district court erred in denying the Appellants' Rule 12(b)(6) motion to dismiss,

and we therefore REVERSE and RENDER, dismissing this case on the grounds of state

sovereign immunity.