Revised December 21, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-31121

---

BOBBY JOE REICKENBACKER; JAMES HOGG; LONNIE BARNES; VIDEL TASBY; WARNER WILEY; MICHEAL JUENGAIN,

                                        Plaintiffs-Appellees,

                        versus

M J FOSTER, JR, Etc; ET AL,

                                        Defendants,

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,
                                        Defendant-Appellant.

---

Appeal from the United States District Court
For the Middle District of Louisiana

---

December 3, 2001

Before REAVLEY, HIGGINBOTHAM, and PARKER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     We are asked to decide whether Title II of the Americans with Disabilities Act of 1990 and § 504 of the Rehabilitation Act of 1973 validly abrogate Eleventh Amendment sovereign immunity.  We hold that they do not, and that the state defendant here is entitled to sovereign immunity.  We therefore reverse.

I

On October 29, 1999, the plaintiffs filed a complaint in federal district court seeking injunctive relief for a proposed class of mentally ill prisoners in Louisiana for allegedly deficient mental health services. That complaint asserted claims against state officers under the Eighth Amendment and 42 U.S.C. § 1983, and claims against both state officers and the Louisiana Department of Public Safety and Corrections ("LDPSC") under Title II of the Americans with Disabilities Act[1] and § 504 of the Rehabilitation Act.[2]

Plaintiffs amended their complaint to seek relief under the ADA and Rehabilitation Act only against LDPSC. LDPSC, asserting sovereign immunity, moved to dismiss the claim. The motion was denied, and LDPSC appeals.

II

Under the collateral order doctrine, we have jurisdiction over this appeal from a denial of a motion to dismiss on the grounds of state sovereign immunity.[3] Our review is *de novo*.[4]

---

[1] 42 U.S.C. § 12312.

[2] 29 U.S.C. § 794(a).

[3] *Ysleta Del Sur Pueblo v. Laney*, 199 F.3d 281, 284-85 (5th Cir. 2000).

[4] *Id.*

## III

The Eleventh Amendment, while textually extending sovereign immunity only to suits against a State by citizens of another state,[5] also confirms that the Constitution's grant of judicial power did not contemplate suits against the sovereign States without their consent.[6]  Sovereign immunity can be waived,[7] of course, and it is no bar to suits for injunctive relief against state officials.[8] But there is no waiver here, nor any effort to properly proceed under *Ex parte Young*.[9]

Congress may abrogate state sovereign immunity when it "both unequivocally intends to do so and 'act[s] pursuant to a valid

---

[5] The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI.

[6] *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1, 15-21 (1890).

[7] *Idaho v. Coeur d'Alene*, 521 U.S. 261, 267 (1997).  The plaintiffs invoke this exception in the context of their Rehabilitation Act claim.  *See* Part V.

[8] *Ex parte Young*, 209 U.S. 123, 159-60 (1908).

[9] The plaintiffs maintain that the *Ex parte Young* exception should be open to them because their original complaint named state officials as defendants. In the face of a statutory argument that the ADA did not permit suits against individuals, the plaintiffs amended their complaint to remove the state officials as defendants.  It is axiomatic that *Ex parte Young* does not provide an exception to sovereign immunity when a State (or its agency) is the defendant. *See, e.g. Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). The fact that the plaintiffs' original complaint named the "correct" defendants does not alter our determination that the *Ex parte Young* exception is unavailable in the case now before us.

grant of constitutional authority.'"[10] The ADA and Rehabilitation Act indisputably contain unequivocal statements of intent to abrogate.[11] It is now settled that Congress may not act to abrogate state sovereign immunity through any of its Article I enumerated powers,[12] but may abrogate state sovereign immunity through a proper exercise of its powers under § 5 of the Fourteenth Amendment.[13] As a result, States may only be sued under the ADA and Rehabilitation Acts to the extent that those statutes, inasmuch as they are directed at unconstitutional discrimination by the States,[14] are appropriate exercises of the § 5 power.[15] Before reaching this question, we first address whether our prior holding that Title II validly abrogated state sovereign immunity binds us still.

---

[10] *Board of Trustees of the Univ. of Ala. v. Garrett*, 121 S.Ct. 955, 961 (2001) (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000)).

[11] *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."); 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 ...."); *see also Garrett*, 121 S.Ct at 962 (finding unequivocal statement requirement met for ADA).

[12] *Seminole Tribe*, 517 U.S. at 72-73.

[13] *Id.* at 59.

[14] *See* Part IV.D.2 and note 60.

[15] *Garrett*, 121 S. Ct. at 962. Congress invoked § 5 in enacting the ADA. *Id.* at 962 n.3 (citing 42 U.S.C. § 12101(b)(4)).

4

IV

A

LDPSC must demonstrate here that our decision in *Coolbaugh v. Louisiana*[16] that Title II of the ADA validly abrogated Eleventh Amendment sovereign immunity has been so undercut by recent decisions of the Supreme Court that it no longer binds us.[17] "It is the practice of this Circuit for three-judge panels to abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc."[18]

B

In *Coolbaugh*, this Court held, following the Supreme Court's analytical framework in *City of Boerne v. Flores*,[19] that the ADA validly abrogated state sovereign immunity as an exercise of the §

---

[16] 136 F.3d 430 (5th Cir. 1998).

[17] The parties agree that Title II of the ADA and § 504 of the Rehabilitation Act should be treated identically in our sovereign immunity analysis. Since the two statutes offer virtually identical protections, the abrogation analysis is the same. *See, e.g., Garcia v. SUNY Health Sciences Center of Brooklyn*, No. 00-9223, 2001 WL 1159970, at *10 (2d Cir. Sept. 26, 2001).

[18] *United States v. Kirk*, 528 F.2d 1057, 1063 (5th Cir. 1976); *see also Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1103 (5th Cir. 1997) ("Accordingly, for a panel of this court to overrule a prior decision, we have required a Supreme Court decision that has been fully heard by the Court and establishes a rule of law inconsistent with our own.").

[19] 521 U.S. 507 (1997).

power.  While the suit was brought under Title II of the ADA,[20]

*Coolbaugh* also analyzed and referred to other portions of the ADA,

most notably Title I:

> We are persuaded that Congress' scheme in the ADA to
> provide a remedy to the disabled who suffer
> discrimination and to prevent such discrimination is not
> so draconian or overly sweeping to be considered
> disproportionate to the serious threat of discrimination
> that Congress perceived .... For example, in *Title I, 42*
> *U.S.C. Section 12112(b)(5)(A) declares it discriminatory*
> *to reject an employee whose mental or physical limitation*
> *may be reasonably accommodated* .... Congress made these
> particularized judgments after hearing testimony on the
> reasonableness and feasibility of these provisions.
>
> In sum, *the ADA* represents Congress' considered efforts
> to remedy and prevent what it perceived as serious,
> widespread discrimination against the disabled.[21]

In light of its holistic approach, other courts have characterized

*Coolbaugh* as holding that the entire ADA abrogates state sovereign

immunity, not just Title II.[22]

Of course, *Coolbaugh*'s upholding of Title I has already been

overruled in *Garrett v. Board of Trustees of the University of*

*Alabama,*[23] which held that Title I of the ADA did not validly

---

[20] 42 U.S.C. § 12132 (forbidding discrimination against the disabled in "services, programs, or activities of a public entity").  Title I deals with discrimination in employment practices.  42 U.S.C. §§ 12111 to 12117.

[21] *Coolbaugh*, 136 F.3d at 437-38 (emphasis added).

[22] *See, e.g., Neinast v. Texas*, 217 F.3d 275, 280 n.29 (5th Cir. 2000); *Thompson v. Colorado,* 258 F.3d 1241, 1249 n.4 (10th Cir. 2001) (citing "courts [that] have addressed the Eleventh Amendment by broadly considering the entire ADA").

[23] 121 S. Ct. 955 (2001).

abrogate state sovereign immunity.[24]  At the same time, *Garrett* expressly declined to decide whether Title II of the ADA similarly failed to abrogate state sovereign immunity.[25]


C

This Court has suggested several times that *Coolbaugh* may no longer be good law.[26]  The plaintiffs argue, however, that our decision in *Neinast v. Texas*[27] reaffirmed *Coolbaugh* after the Supreme Court's decision in *Kimel v. Florida Board of Regents*.[28] LDPSC disagrees, which it must, arguing that *Kimel* implicitly overruled *Coolbaugh*.

In *Neinast*, we struck down certain regulations promulgated by the Attorney General of the United States, which prohibited the

---

[24] *Id.* at 960.

[25] *Id.* at 960 n 1 ("We are not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question.").

[26] *See Shaboon v. Duncan*, 252 F.3d 722, 737 (5th Cir. 2001) (stating that "*Coolbaugh* would ordinarily remain governing law in this circuit unless the analysis in *Garrett* plainly applies to Title II suits so as to overrule *Coolbaugh* sub silentio," but refusing to reach that question, which had not been briefed); *Kazmier v. Widmann*, 225 F.3d 519, 529 (5th Cir. 2000) ("[T]he continuing validity of *Coolbaugh* has been called seriously into question by the Supreme Court's subsequent decision in *Kimel*."). Additionally, this Court affirmed, in light of *Garrett*, a prescient district court decision that explicitly stated that *Coolbaugh* was no longer good law in light of *Kimel* before *Garrett* was decided. *See Cooley v. Mississippi Dep't of Trans.*, 96 F. Supp.2d 565, 568 (S.D. Miss. 2000), *aff'd by unpublished opinion*, 254 F.3d 70 (5th Cir. 2001) (per curiam).

[27] 217 F.3d 275 (5th Cir. 2000).

[28] 528 U.S. 62 (2000).

7

charging of fees for handicapped parking placards, as beyond the power of Congress to abrogate state sovereign immunity, and *a fortiori* beyond the Attorney General's delegated legislative authority.[29]  Before deciding the case on those grounds, we stated that "circuit precedent bars our consideration of whether the ADA as a whole exceeds Congress's power to abrogate under § 5."[30]

*Neinast* was decided after *Kimel*, and therefore the plaintiffs argue that *Kimel* does not affect *Coolbaugh*.  The plaintiffs misread *Neinast*.  Anticipating the tightening in *Garrett*, we noted that *Kimel* "possibly suggests a more vigorous application of the congruence and proportionality test than the *Coolbaugh* court gleaned from *City of Boerne*."[31]  *Neinast* did not need to go further and reach the validity of the statute, because it concluded that the regulations at issue *did not* validly abrogate state sovereign immunity.  The narrowness of *Neinast* reflected the reality that it ought to wait for *Garrett*.[32]

Turning now to *Kimel* and *Garrett*, we conclude that the analysis in these cases undercuts our approach in *Coolbaugh*.  As a result, we are persuaded that the Supreme Court has effectively overruled *Coolbaugh*.

---

[29] *Neinast*, 217 F.3d at 282.

[30] *Id.* at 280.

[31] *Id.* at 280 n.29.

[32] *See id.*

8

D

1

To determine whether the ADA was a valid exercise of the § 5 power, *Coolbaugh* first examined the scope of the constitutional right, repairing to *City of Cleburne v. Cleburne Living Center, Inc.*[33]  *Coolbaugh* did so because in *Cleburne* the Court held unconstitutional under the Equal Protection Clause the refusal of a local government to grant a special use permit for the operation of a group home for the mentally retarded.  Significantly, the Court specifically refused to grant to disabled persons "suspect class" status.[34]  Since then, courts have universally applied the "rational basis" standard to classifications involving physical disabilities.[35]

Some have read *Cleburne* to prohibit all state decisionmaking based upon animus against a particular group,[36] a view that *Garrett*

---

[33] 473 U.S. 432 (1985).

[34] *Id*. at 446.

[35] *See Coolbaugh*, 136 F.3d at 433-34 n.1 (listing cases).

[36] *See, e.g., Garrett*, 121 S. Ct. at 971 (Breyer, J., dissenting) ("Adverse treatment that rests upon such motives is unjustified discrimination in *Cleburne*'s terms.").

rejected.[37]  *Coolbaugh* deployed the rational basis standard,[38] but

*Garrett* further refined the test:

> Thus, the result of *Cleburne* is that States are not required by the Fourteenth Amendment to make *special accommodations* for the disabled, as long as their actions towards such individuals are rational ....  If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause.[39]

In sum, the Court engaged in a more searching analysis of the scope

of the Equal Protection right, but that enterprise exposes no

deficiency of *Coolbaugh*.  Rather, its bite was elsewhere.


2


*Coolbaugh* then applied *City of Boerne* to the ADA, insisting

upon "a congruence and proportionality between the injury to be

prevented or remedies and the means adopted to that end."[40]  As

instructed by *City of Boerne*, *Coolbaugh* looked to the findings

Congress made when adopting the ADA to decide first the magnitude

of the problem Congress sought to remedy.  This analysis did not

distinguish state discrimination from private or general societal

discrimination.  Instead, *Coolbaugh* observed only that "the

---

[37] *Id.* at 964 ("Although such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make.").

[38] *Coolbaugh*, 136 F.3d at 434.

[39] *Garrett*, 121 S. Ct. at 964 (emphasis added).

[40] *City of Boerne*, 521 U.S. at 520.

10

extensive record compiled in the legislative history fully supports Congress' detailed findings of a serious and pervasive problem of discrimination against the disabled."[41]

The Supreme Court soon thereafter again narrowed the § 5 grant of authority to Congress, first in *Florida Prepaid Postsecondary Educational Expense Board v. College Savings Bank*,[42] and then in *Kimel* and *Garrett*. In these cases, the Court directed us to look to specific findings of unconstitutional discrimination by States in a § 5 abrogation analysis.[43] Additionally, in *Garrett*, the Court delineated the types of state unconstitutional action that can form the foundation upon which Congress uses its § 5 remedial power. *Garrett* insisted that Congress identify unconstitutional discrimination by *the States*, not local governments,[44] which do not benefit from the protections of the Eleventh Amendment and therefore cannot form the basis for an exercise of the § 5 power *to abrogate* state sovereign immunity.[45] Thus *Coolbaugh*'s analysis of

---

[41] *Coolbaugh*, 136 F.3d at 437.

[42] 527 U.S. 627 (1999).

[43] *Id.* at 639; *Kimel*, 528 U.S. at 89 ("Congress never identified any pattern of age discrimination by the States ...."); *Garrett*, 121 S. Ct. at 964-65 ("Once we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled.").

[44] *Id.* at 965.

[45] *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890).

11

the legislative role has been preempted by these later decisions of the Supreme Court.

3

In assessing the proportionality of the ADA to the injury identified, *Coolbaugh* concluded that "Congress' scheme in the ADA to provide a remedy to the disabled who suffer discrimination and to prevent such discrimination is not so draconian or overly sweeping to be considered disproportionate to the serious threat of discrimination Congress perceived."[46]  In support of this, the opinion pointed to provisions of *both* Title I and Title II of the ADA, but did not lay them next to the baseline of what defines constitutional state action under the Fourteenth Amendment.[47]

Both *Kimel* and *Garrett* require more.  Each decision dissects the statutory regime in question and carefully compares it to the baseline definition of constitutional action under the Fourteenth Amendment.  In *Kimel* the Court considered the bona fide occupational qualification defense to an age discrimination claim in the ADEA and the burden of proof in a *prima facie* case under the ADEA.[48]  *Garrett* specifically focused on the burdens of proof,

---

[46] *Coolbaugh*, 136 F.3d. at 437.

[47] *Id.* at 437-38 ("We recognize that in some instances, the provisions of the ADA will prohibit conduct which is not itself unconstitutional and intrude into legislative spheres of autonomy previously reserved to the States.") (internal quotation omitted).

[48] *Kimel*, 528 U.S. at 87-88.

12

exceptions, and defenses available in Title I of the ADA in order to find that "the rights and remedies created by the ADA against the States raise the same sort of concerns as to congruence and proportionality as were found in *City of Boerne*."[49]

*Coolbaugh* engaged in no detailed discussion of the rights and remedies available under Title II of the ADA. The distinction between Title I and Title II, and the necessity of their separation for purposes of the abrogation analysis, was underscored by the Court in *Garrett* when it declined to reach Title II because of its "somewhat different remedial provisions."[50] Since the constitutional analysis now requires a greater level of specificity than employed in *Coolbaugh*, we are persuaded that it has been effectively overruled.

V

A

Since *Coolbaugh* is no longer controlling precedent in our circuit, we must consider Title II of the ADA anew. Some of our sister circuits have already held that Title II, or a specific regulation promulgated pursuant to Title II, does *not* abrogate

---

[49] *Garrett*, 121 S. Ct. at 966.

[50] *Id.* at 960 n. 1.

13

state sovereign immunity.[51]  We have discussed the scope of state constitutional activity with respect to the disabled,[52] and now ask if Congress has identified "a history and pattern of unconstitutional [] discrimination by the States against the disabled"[53] in the provision of government services, programs, or activities. Next, we ask whether Title II is "congruent and proportional" to the constitutional violation Congress sought to remedy.

B

Congress, in enacting the ADA, specifically cited discrimination in "public accommodations, public services, transportation, and telecommunications."[54]  "[H]owever, Congress' determination of what constitutes 'discrimination' against the disabled differs from discrimination in the constitutional sense."[55]

In arguing that Congress made the requisite findings of state discrimination against the disabled, the plaintiffs refer us to the report of the Task Force on Rights and Empowerment of Americans

---

[51] *See Garcia,* 2001 WL 1159970 at *7-8; *Thompson*, 258 F.3d at 1255; *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010 (8th Cir. 1999) (en banc); *Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698, 706 (4th Cir. 1999) (finding regulation enacted pursuant to Title II could not abrogate state sovereign immunity).

[52] *See* Part III.D.1.

[53] *Garrett*, 121 S. Ct. at 964.

[54] *Id.* at 966 (quoting H.R. Rep. No 101-485, pt. 2 p. 28 (1990)).

[55] *Thompson*, 258 F.3d at 1254.

with Disabilities. The plaintiffs argue that Justice Breyer's appendix to his dissent in *Garrett*, which summarizes the individual submissions to this task force, shows the extent of unconstitutional discrimination against the disabled. First, we note that the Court described these legislative findings as "unexamined, anecdotal accounts of 'adverse disparate treatment by state officials.'"[56] The Court focused on the absence of findings of state discrimination in *employment* and stated that most of the examples provided by the task force "pertain to alleged discrimination by the States in the provision of public services and public accommodation ... addressed in Titles II and III of the ADA."[57]

A closer look at the legislative history indicates that most of the examples of arguably unconstitutional governmental discrimination against the disabled involved local, not state, government.[58] Therefore, examples such as Justice Breyer's first: "discrimination against the mentally ill in city zoning process,"[59] are insufficient, because *Garrett* directs us to look only to

---

[56] *Garrett*, 121 S. Ct. at 966 (quoting *id.* at 970 (Breyer, J., dissenting)).

[57] *Id.* at 966 n.7.

[58] *See, e.g., id.* at 977-93; *Thompson*, 258 F.3d at 1254 (noting that the legislative findings deal primarily with local government "discrimination" in public accommodation).

[59] *Garrett*, 121 S. Ct. at 977 (Breyer, J., dissenting).

15

unconstitutional discrimination *by the States*.[60]

Moreover, many of the findings to which we are referred by the plaintiffs describe facially neutral state policies that are unlikely to represent unconstitutional discrimination. In order to prove a violation of the Equal Protection Clause, a plaintiff must show that a facially neutral state law or practice that has a disparate impact on a class is intentionally discriminatory.[61] What the Congress has adduced are examples of facially neutral policies that allegedly have a discriminatory impact on the disabled.[62] "Apathetic attitudes and refusals to make accommodations do not usually violate the Fourteenth Amendment."[63]

C

---

[60] This narrowing of the analysis in *Garrett* means that Title II of the ADA could still be a valid exercise of Congress' § 5 power, but simply not provide the basis for a *use* of that power to abrogate, thus drawing a distinction between *City of Boerne* and *Seminole Tribe*. *See Thompson*, 258 F.3d at 1253 n.7 ("Because the Fourteenth Amendment applies to local government entities not entitled to Eleventh Amendment immunity, the analysis of whether Congress has the power to enact legislation requires inquiry into constitutional violations by these entities in addition to entities entitled to Eleventh Amendment immunity.").

[61] *Washington v. Davis*, 426 U.S. 229 (1976).

[62] *See, e.g., Garrett*, 121 S. Ct. at 979 (Breyer, J., dissenting). The word "inaccessible," without more, in this context, is synonymous with "constitutional" as it implies a facially neutral state policy without evidence of discriminatory intent. "Inaccessible" appears over 250 times in Justice Breyer's list of "roughly 300 examples of discrimination by state governments." *Id.* at 970, 977-993. The plaintiffs cite to this list as providing life to their claim that there are sufficient Congressional findings of discrimination in public accommodation. In fact the list is fatal to the plaintiffs' case, because it catalogs presumptively constitutional state action.

[63] *Thompson*, 258 F.3d at 1254.

16

If we were to find the requisite pattern of unconstitutional discrimination by the States against the disabled, we would still be faced with a remedial regime that "raise[s] the same sort of concerns as to congruence and proportionality as were found in *City of Boerne*."[64]

Title II indisputably embodies more than merely a prohibition on unconstitutional discrimination against the disabled.  Although it states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity,"[65] other portions of the statute, case law, and regulations promulgated under Title II create an affirmative accommodation obligation on the part of public entities that far exceeds the constitutional boundaries.

First, the ADA defines "qualified individual with a disability" as:

> an individual with a disability, who *with or without reasonable modifications to rules, policies or practices*, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.[66]

---

[64] *Garrett*, 121 S. Ct. at 966.

[65] 42 U.S.C. § 12132.

[66] 42 U.S.C. § 12131(2) (emphasis added).

Thus, Title II imposes an accommodation obligation on public entities, requiring them to make "reasonable modifications."[67]

Furthermore, courts have recognized that Title II imposes such an affirmative obligation,[68] as does the Rehabilitation Act, which is virtually identical to Title II.[69] Regulations issued by the Justice Department confirm such an obligation, because they purport to define its boundaries, creating a defense when modifications will "fundamentally alter the nature of the service, program, or activity."[70] The burden of proof on this affirmative defense, of course, lies with the State—creating another disjunction between the remedy and injury that contributes to the failure of Title II in the proportionality and congruence analysis.[71]

Since the accommodation obligation imposed by Title II and § 504 of the Rehabilitation Act far exceeds that imposed by the Constitution, we cannot conclude that they are proportional and

---

[67] Title II also imposes restrictions on the purchase of new public transportation vehicles, requiring them to be accessible. 42 U.S.C. §§ 12142 to 12144.

[68] *See, e.g., Thompson*, 258 F.3d at 1250-51; *Alsbrook*, 184 F.3d at 1009; *Coolbaugh*, 136 F.3d at 437.

[69] *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n.17 (1987).

[70] 28 C.F.R. § 35.130(b)(7).

[71] *See* Part IV.D.3; *Garrett*, 121 S. Ct. at 967.

18

congruent to the legislative findings of unconstitutional discrimination against the disabled by the States.[72]

V

Finally, the plaintiffs argue that Louisiana has waived its sovereign immunity under the Rehabilitation Act by accepting federal monies.[73] We generally will not consider arguments not raised in the district court unless it is a pure question of law and our refusal to consider the question will result in a miscarriage of justice.[74] We therefore decline to reach this question.

---

[72] We are aware of the approach adopted by the Second Circuit in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, No. 00-9223, 2001 WL 1159970 (2d. Cir. Sep. 26, 2001), which held that certain claims against the States under Title II may proceed even though Title II as a whole cannot abrogate state sovereign immunity. Garcia noted first that Title II incorporates the remedial regime of the Rehabilitation Act, which in turn incorporates the remedial regime of Title VI of the Civil Rights Act, which the Court has held includes an implied private cause of action. *See id.* at *8-9. Using its power to shape the judicially implied remedy, the *Garcia* court imposed its own restriction on the availability of relief under Title II; requiring plaintiffs "to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Garcia*, 2001 WL 1159970 at *9. Garcia concluded that this restriction, because it encompassed "generally the same actions that are proscribed by the Fourteenth Amendment" limited Title II "so as to comport with Congress's § 5 authority." *Id*.

We need not reach this question, as the parties have not raised it in this case. We note, however, that *Garcia* would allow recovery for a State's refusal to accommodate the disabled in violation of Title II, provided that decision was motivated by discriminatory animus. *See id.* at *7, *10. The *Garcia* remedy therefore apparently suffers from the same defect that we have identified in Title II, because the Constitution imposes no such accommodation obligation. *Garcia*'s solution may be additionally flawed because, as we have noted, not all decisions governed by animus violate the Fourteenth Amendment. *See* Part IV.D.1.

[73] 42 U.S.C. § 2000d-7; *Lane v. Pena*, 518 U.S. 187, 200 (1996) (holding that Congress created a waiver of Eleventh Amendment immunity under the Rehabilitation Act).

[74] *McDonald's Corp v. Watson*, 69 F.3d 36, 44 (5th Cir. 1995).

19

VI

Since Congress has not validly acted through its Fourteenth Amendment § 5 power to abrogate state sovereign immunity, LDPSC was entitled to dismissal of both the Title II and Rehabilitation Act claims.  We therefore REVERSE.