United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 11, 2004**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 2, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-50608

_____

CHRISTY MCCARTHY, By and through her next friend Jamie
Travis; TODD GORDON, By and through his next friend Trisha
Gordon; ALLISON PRATT, By and through her next friend Paula
Pratt; GAIL TRUMAN, By and through her next friend Ken
Truman; JIM FLOYD, JR, By and through his next friend Jim
Floyd, Sr; SAM LINDSAY, By and through his next friend Betty
Lindsay; OSHEA BROOKS; JOE RAY COMACHO; MICHA CHASTAIN, By
and through his next friend Lori Chastain; AL, By and
through his next friend LL; ARC OF TEXAS, On behalf of its
members and for those similarly situated; SUE ANN ORTIZ;
PATRICK SOSTACK, By and through their parents and next
friends Gary and Lisa Sostack; SCOTT SOSTACK, By and through
their parents and next friends Gary and Lisa Sostack; SHYAN
FOROUGH, By and through his parents and next friends Reza
and Arzu Forough; DAVID ZWEIFEL, By and through his parents
and next friends Linda and Leroy Zweifel; ASHTON BOWLEN, By
and through her mother and next friend Patricia Bowlen;
TYLER BLANCHARD, By and through his mother and next friend
Faith Blanchard; GARRETT GILLARD, By and through his mother
and next friend Keeya Gillard; KAMERON LANE, By and through
his mother and next friend Angie Lane; MADISON POLK, By and
through her father and next friend John Polk; PAIGE SMITH,
By and through her mother and next friend Gretta Smith

                        Plaintiffs - Appellees

v.

ALBERT HAWKINS, Etc.; ET AL

                        Defendants

ALBERT HAWKINS, In his official capacity as Commissioner of
the Texas Health and Human Services Commission;
KAREN F HALE, In her official capacity as Commissioner of
the Texas Department of Mental Health & Mental Retardation;
JAMES R HINE, In his official capacity as Commissioner of
the Texas Department of Human Services

                        Defendants - Appellants

Before KING, Chief Judge, and REAVLEY and EMILIO M. GARZA, Circuit Judges.

KING, Chief Judge:

Plaintiffs sued several Texas state officials, asserting violations of the Medicaid statute, the Americans with Disabilities Act, and the Rehabilitation Act. Relying in part on state-sovereign immunity, Defendants moved the district court to dismiss Plaintiffs' claims. The district court denied Defendants' motion in part, concluding that the doctrine of Ex parte Young, 209 U.S. 123 (1908), provided jurisdiction over this official-capacity suit seeking prospective relief against state officers. Disappointed, Defendants filed this interlocutory appeal, seeking to vindicate their Eleventh Amendment immunity from suit. We agree with the district court that state officers, sued in their official capacities for prospective relief, are proper defendants under Title II of the Americans with Disabilities Act and are not immune under the Eleventh Amendment. Further, we hold that Defendants' other contentions on appeal relate to the merits of this controversy, not the Eleventh Amendment; therefore, these arguments are beyond the scope of this interlocutory appeal. We affirm.

## I. Background

Plaintiffs are twenty-one mentally disabled Texas residents (most of whom sue through their next friends) and the Arc of Texas (a nonprofit organization that advocates for the rights of individuals with mental disabilities). In September 2002, they brought this action, on behalf of themselves and all others similarly situated,[1] against Defendants. Defendants are three Texas state officers sued in their official capacities as Commissioners of the Texas Health and Human Services Commission, the Texas Department of Human Services, and the Texas Department of Mental Health and Mental Retardation.[2] Plaintiffs allege that Defendants are not adequately providing community-based living options to individuals, like themselves, with mental retardation and other developmental disabilities.

The programs to which Plaintiffs seek access are offered by Texas as part of its Medicaid plan. Title XIX of the Social Security Act established Medicaid, a cooperative federal-state program that provides federal funding to states that furnish medical services to needy individuals. See 42 U.S.C. §§ 1396-1396v (2000); Frew v. Hawkins, 124 S. Ct. 899, 901 (2004). While state participation is voluntary, if a state elects to join the program, it must administer a state plan that meets federal

---

[1]    Plaintiffs filed a motion for class certification, which is still pending in the district court.

[2]    We also refer to Defendants collectively as "Texas" or "the State."

requirements.  See 42 U.S.C. § 1396a(a) (describing the required contents of a state plan); Frew, 124 S. Ct. at 901.  States can, however, obtain certain waivers, which allow them to deliver experimental services under a relaxed set of regulatory strictures.  One such waiver permits states to offer home and community-based services for disabled individuals who would otherwise require institutional care.  See 42 U.S.C. § 1396n(c)(1).  Under a § 1396n(c) waiver, certain obligations that otherwise attach to states' provision of Medicaid services are waived, and participating states may obtain federal reimbursement for services that would not normally be reimbursable under the Medicaid program.  See id. § 1396n(c)(3) (detailing the requirements that may be waived under a § 1396n(c) waiver); id. § 1396n(c)(4)(B) (explaining the services that may be provided under a § 1396n(c) waiver).

Plaintiffs' claims center on two § 1396n(c) waiver programs offered by Texas for mentally disabled individuals.  First, the Home and Community-Based Waiver Services program (the "HCS" program) provides services that enable individuals with mental retardation to remain at home, live independently, or live in small home-like settings.  The HCS program thereby helps those individuals avoid institutional living environments.  Second, the Community Living Assistance and Support Services waiver program (the "CLASS" program) provides similar assistance to individuals with other developmental disabilities.

## II.  Proceedings in the District Court

Plaintiffs' second amended complaint alleges that Defendants have denied them access to the HCS and CLASS programs.  According to Plaintiffs, this denial of access violates several provisions of federal law--namely, (1) four subsections of the federal Medicaid statute, including its due process provision (i.e., § 1396a(a)(3)[3]), and its implementing regulations; (2) Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165 (2000), and its implementing regulations; (3) § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794(a) (West 1999 & Supp. 2004), and its implementing regulations; and (4) the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Plaintiffs assert causes of action under 42 U.S.C. § 1983, Title II, and § 504, and they seek declaratory and injunctive relief.

Defendants moved to dismiss under Rule 12(b)(6) and Rule 12(b)(1), contending that several of Plaintiffs' claims failed to state a claim upon which relief could be granted and asserting Eleventh Amendment immunity from the entire suit.  In May 2003, the district court granted Defendants' motion in part and denied it in part.  The district court dismissed, for failure to state a

---

[3]    According to this subsection, a state's Medicaid plan must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  42 U.S.C. § 1396a(a)(3).

claim, Plaintiffs' Due Process and Equal Protection claims.

Similarly, the court dismissed, for failure to state a claim, all

but one of Plaintiffs' § 1983 claims regarding alleged

infringements of the Medicaid statute, concluding that only the

due process provision in § 1396a(a)(3) was enforceable under

§ 1983.[4]  Concerning Plaintiffs' Title II and § 504 causes of

action, the court ruled that Plaintiffs' complaint did state

actionable claims under each statute.  Further, since Plaintiffs

sued state officers for prospective relief, the court relied on

the doctrine of Ex parte Young in holding that the Eleventh

Amendment did not bar Plaintiffs' Title II and § 504 claims.

In sum, the district court allowed three of Plaintiffs'

causes of action to proceed: (1) their § 1983 claim based on

violations of the due process provision of the Medicaid statute

(§ 1396a(a)(3)); (2) their Title II claim; and (3) their § 504

claim.  Defendants appeal from that portion of the district

court's May 2003 order that denied their motion to dismiss on the

basis of Eleventh Amendment immunity.  Under the collateral order

doctrine, this court has jurisdiction over an interlocutory

appeal from a denial of a motion to dismiss asserting Eleventh

---

[4]     While the district court did not expressly discuss
Defendants' Eleventh Amendment-immunity defense to Plaintiffs'
surviving § 1983 claim (for violation of § 1396a(a)(3)), since
this claim was not dismissed, the court must have rejected that
defense, probably believing that this claim was also permissible
under Ex parte Young.  On appeal, Defendants do not complain
about this omission from the district court's opinion.

Amendment immunity.  See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-45 (1993).  In November 2003, this court granted the United States's unopposed motion to intervene on behalf of Plaintiffs.[5]

### III.  Standard of Review

This court reviews denials of Eleventh Amendment immunity de novo.  Cozzo v. Tangipahoa Parish Council--President Gov't, 279 F.3d 273, 280 (5th Cir. 2002).

### IV.  Texas's Entitlement to Eleventh Amendment Immunity From Suit

The Eleventh Amendment has been interpreted by the Supreme Court to bar suits by individuals against nonconsenting states. Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001).  In addition, the principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, see Edelman v. Jordan, 415 U.S. 651, 663-69 (1974), subject to an established exception: the Ex parte Young doctrine.  Under Ex parte Young, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." Quern v. Jordan, 440 U.S. 332, 337 (1979).  Here, the district court relied on the Ex parte Young exception in ruling that the Eleventh Amendment does not bar Plaintiffs' claims.

---

[5]    We refer to the United States as "the government" in this opinion.

## A. The Parties' Contentions

Texas maintains that a plaintiff may not proceed under Ex parte Young unless she asserts a violation of a federal right that arises from a valid federal law that is enforceable against the defendant state. In Texas's view, Plaintiffs' § 1983, Title II, and § 504 claims do not satisfy these prerequisites to an Ex parte Young action because none alleges a violation of a valid federal right that is enforceable against Defendants. Texas presents four arguments on appeal. First, Texas contends that the district court incorrectly determined that Plaintiffs can enforce the due process provision of the federal Medicaid law, § 1396a(a)(3), under § 1983. Second, Texas asserts that an action cannot be brought under Ex parte Young to enforce Title II of the ADA, since a state officer is not a proper defendant under Title II. Third, the State argues that Congress lacked the power under either § 5 of the Fourteenth Amendment or the Commerce Clause to enact the substantive requirements in Title II and that Title II violates the Tenth Amendment. Fourth, Texas maintains that § 504 of the Rehabilitation Act is unconstitutional as applied to Defendants because it violates the relatedness requirement imposed on Spending Clause legislation in South Dakota v. Dole, 483 U.S. 203, 207 (1987). Accordingly, Texas contends that state-sovereign immunity bars Plaintiffs' suit because Plaintiffs have not alleged a violation of any valid

8

federal law.

Plaintiffs and the government respond that Texas is attempting impermissibly to broaden the scope of this interlocutory appeal. By articulating these "prerequisites" to an Ex parte Young suit, they assert, the State invites this court to reach the merits of Plaintiffs' claims and Defendants' defenses to liability. Instead, Plaintiffs argue, this court must limit its review to whether the district court correctly concluded that Texas's Eleventh Amendment immunity from suit does not bar it from hearing Plaintiffs' § 1983, Title II, and § 504 claims. Accordingly, Plaintiffs and the government maintain that this court should refuse to consider all but one of Texas's arguments, i.e., its contention that an Ex parte Young suit cannot be brought to enforce Title II.

Since Plaintiffs and the government concede that Texas's second contention is an appropriate subject of consideration in this interlocutory appeal, we address this argument first.

B.  **Whether state officers are proper defendants under Title II**

Title II provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2000). The State asserts that the district court erred

9

in denying it Eleventh Amendment immunity from Plaintiffs' cause of action under Title II because a claim cannot be brought under Ex parte Young to enforce that statute. Texas maintains that a state officer is not a proper defendant under Title II; only public entities can be sued under the statute. Thus, since Ex parte Young only allows suits against state officers, Texas reasons that Plaintiffs' Title II claims must be dismissed. In response, Plaintiffs and the government argue that Title II can be enforced through suits for prospective relief against state officers, even though the substantive requirements of the statute apply only to public entities, because a suit against a state officer in her official capacity is really a suit against the state agency itself.

Texas's contention presents an issue of first impression in this circuit. The State relies primarily on the Seventh Circuit's opinion in Walker v. Snyder, 213 F.3d 344 (7th Cir. 2000).[6] In Walker, the court held that a plaintiff could not

---

[6] Texas also cites Lewis v. N.M. Dep't of Health, 94 F. Supp. 2d 1217 (D.N.M. 2000). There, the court held that an Ex parte Young action could not be maintained under Title II because state officials are not proper defendants under the statute. Id. at 1230. Without engaging in much analysis, the court relied on one circuit court opinion involving state officers sued in their individual capacities, see Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc), and several district court decisions. Lewis, 94 F. Supp. 2d at 1230. While the Lewis court's judgment was upheld on appeal, the Tenth Circuit did not pass on this holding, since the plaintiffs had dropped their ADA claim. Lewis v. N.M. Dep't of Health, 261 F.3d 970, 975 (10th Cir. 2001).

10

bring an Ex parte Young suit to enforce Title II because the only proper defendant "is the public body as an entity." Id. at 347. But Walker, decided in 2000, has been undermined by the Supreme Court's subsequent statement in Garrett that Title I of the ADA could be enforced in an Ex parte Young action. Garrett, 531 U.S. at 374 n.9. Indeed, the Seventh Circuit has disavowed Walker's holding on this issue, concluding that it "did not survive" Garrett. Bruggeman v. Blagojevich, 324 F.3d 906, 912-13 (7th Cir. 2003). Even though Walker has been abrogated, Texas still contends this court should follow that decision, since the remark from Garrett that the Bruggeman court relied on was dictum.

Although the Court's comment in Garrett was not essential to the judgment, the courts of appeals have been unanimous in rejecting arguments that state officers cannot be sued for prospective relief in their official capacities for violations of Title II.[7] In addition to this substantial authority from other

---

[7] See Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003) (refusing to "embrace the state defendant's statutory claim that an individual sued in his or her official capacity under the doctrine of Ex parte Young is not a 'public entity' subject to liability" under Title II and explaining that, "[t]he real party in interest in an official-capacity suit is the government entity. As a result, it is irrelevant whether the ADA would impose individual liability on the officer sued; since the suit is in effect against the 'public entity,' it falls within the express authorization of the ADA." (citation omitted)); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187-88 (9th Cir. 2003) (following "the Sixth, Seventh, and Eighth Circuits in holding that Title II's statutory language does not prohibit [the plaintiff's] injunctive action against state officials in their official capacities"); Bruggeman, 324 F.3d at 912-13; Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir. 2002) (holding

11

circuits, Supreme Court precedent makes clear that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); accord Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is not a suit against the official personally, for the real party in interest is the entity." (citations and internal quotation marks omitted)).  Only for the purposes of the Eleventh Amendment are "official-capacity actions for prospective relief . . . not treated as actions against the State."  Graham, 473 U.S. at 167 n.14 (citing Ex parte Young).

We thus join the Second, Sixth, Seventh, Eighth, and Ninth Circuits in holding that Plaintiffs' Ex parte Young suit to

_____

that "an official who violates Title II of the ADA does not represent 'the state' for purposes of the Eleventh Amendment, yet he or she nevertheless may be held responsible in an official capacity for violating Title II"); Randolph v. Rodgers, 253 F.3d 342, 348 (8th Cir. 2001) (citing Garrett's dictum and refusing to accept the contention that "because the statutory language of the ADA provides only for 'public entity' liability, an Ex parte Young claim against the state officials in their official capacities, premised upon an ADA violation, must fail").

12

enforce Title II can proceed; Defendants have been sued in their official capacities and are therefore representing their respective state agencies (which are proper Title II defendants) for all purposes except the Eleventh Amendment.[8]

## C.   Texas's other arguments on appeal

When stripped of their Eleventh Amendment gloss, Texas's three remaining arguments essentially target the merits of Plaintiffs' claims, rather than Plaintiffs' reliance on the doctrine of Ex parte Young to establish jurisdiction.  As we will see, these defenses to liability are beyond the scope of this interlocutory appeal from a denial of Eleventh Amendment immunity from suit.  See P.R. Aqueduct & Sewer Auth., 506 U.S. at 144

---

[8]    Texas, relying on Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), also suggests that Title II's use of the phrase "public entity" evidences Congressional intent to preclude Ex parte Young actions to enforce the Act.  But Seminole Tribe provides no comfort to the State.  There, the Court merely explained that, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young."  Id. at 74 (emphasis added). Here, Plaintiffs do not seek under Ex parte Young any remedies that have been limited by the terms of Title II.  In addition, at least two other circuits have specifically rejected arguments, based on Seminole Tribe, that Congress intended to preempt Ex parte Young actions to enforce Title II.  See Henrietta D., 331 F.3d at 289 ("In our view, Seminole Tribe does not bar Ex parte Young relief under Title II against a state official in her official capacity.  Neither § 504 nor Title II displays any intent by Congress to bar a suit against state officials in their official capacities for injunctive relief, nor does either create a remedial scheme so elaborate that it could be thought to preclude relief under Ex parte Young."); Miranda B., 328 F.3d at 1188-89.

13

(explaining that the Eleventh Amendment "confers an immunity from suit").

1. The constitutionality of Title II and § 504

We first turn to Texas's contentions that Congress lacked the power to enact the substantive provisions of Title II and § 504. The State provides no authority for its assertion that a federal court must determine the constitutionality of a federal law in the course of determining the applicability of the Ex parte Young exception. Instead, the State misleadingly quotes the Supreme Court's opinion in Gonzaga University v. Doe for the proposition that, "[a]s a prerequisite to bringing a Young suit, . . . 'a plaintiff must assert the violation of a federal right, not merely a violation of federal law.'" Texas Br. at 13 (quoting Doe, 536 U.S. 273, 282 (2002)). But this passage in Doe involved the prerequisites for stating a claim under § 1983, not the requirements for avoiding an Eleventh Amendment defense to suit through the vehicle of an Ex parte Young action.[9] Texas relies heavily on this misinterpretation of Doe in contending that Plaintiffs cannot proceed under Ex parte Young unless this

---

[9] The full sentence from the opinion reads, "We emphasized: '[T]o seek redress through § 1983, . . . a plaintiff must assert the violation of a federal right, not merely a violation of federal law.'" Doe, 536 U.S. at 282 (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)) (alterations in original) (first emphasis added). Of course, Plaintiffs' Title II and § 504 claims do not arise under § 1983; both Title II and § 504 are enforceable directly through private causes of action. See Barnes v. Gorman, 536 U.S. 181, 185 (2002).

14

court first determines that their claims rely on federal laws that are both constitutional and enforceable against the State. But Texas simply provides no support for its contention that a court must determine the validity of a plaintiff's cause of action in the course of deciding whether an Ex parte Young suit can proceed in the face of a state's Eleventh Amendment defense.

Texas's broad understanding of the scope of this interlocutory appeal is not only unprecedented, more importantly, it flies in the face of the Supreme Court's reasoning in Verizon Maryland, Inc. v. Public Service Commission, 535 U.S. 635 (2002). There, Verizon brought suit in federal district court, seeking relief from an order of the Maryland Public Service Commission. Id. at 640. Verizon alleged that the Commission's order violated federal law. Id. In ruling that the district court lacked jurisdiction to hear Verizon's action, the Fourth Circuit held, inter alia, that the Eleventh Amendment did not permit Verizon to sue individual commissioners in their official capacities. Id. In the words of the Supreme Court, the "Fourth Circuit suggested that Verizon's claim could not be brought under Ex parte Young, because the Commission's order was probably not inconsistent with federal law after all." Id. at 646. The Court swiftly rejected this reasoning, noting that "the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim." Id. (emphasis added). On the contrary, the Court explained that "[i]n determining whether the doctrine of Ex parte

15

Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Id. at 645 (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)) (alteration in original); see also Coeur d'Alene, 521 U.S. at 281 ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the Young fiction." (emphasis added)). Thus, the Court made clear that analyzing the applicability of the Ex parte Young exception should generally be a simple matter, which excludes questions regarding the validity of the plaintiff's cause of action.

Texas attempts to distinguish Verizon, asserting that its arguments contesting the constitutionality of Title II and § 504 are appropriate for consideration in this interlocutory appeal, even though an argument that it has not violated those statutes would not be. We are not persuaded. Like other defenses to liability, the State's arguments do not challenge the district court's power under Ex parte Young to adjudicate Plaintiffs' claims. Rather, the State seeks to have Plaintiffs' Title II and § 504 claims dismissed on the merits on the ground that the statutes' substantive provisions are unconstitutional; such a disposition would not be a determination that the Ex parte Young

16

exception is inapplicable or that the Eleventh Amendment bars a federal court from hearing Plaintiffs' action. In other words, resolution of the constitutional questions urged by Defendants is irrelevant to the question whether Texas's Eleventh Amendment immunity from suit has been infringed. Moreover, our refusal to consider the constitutional issues in this interlocutory appeal comports with the rationale for allowing an interlocutory appeal from denials of Eleventh Amendment immunity. Unlike a State's entitlement to Eleventh Amendment immunity from suit, the constitutionality of Title II and § 504 can be reviewed effectively on appeal from a final judgment. Cf. P.R. Aqueduct & Sewer Auth., 506 U.S. at 144-45 (explaining that the question of state-sovereign immunity is (1) conclusively determined by the denial of a motion to dismiss, (2) completely separate from the merits of the action, and (3) "effectively unreviewable on appeal from a final judgment"). We consequently follow the teaching of Verizon and hold that the constitutionality of the substantive provisions of Title II and § 504 is beyond the scope of this appeal.

2. The enforceability of § 1396a(a)(3) under § 1983

Finally, we consider Texas's assertion that the Eleventh Amendment bars Plaintiffs' surviving § 1983 claim because the due process provision of the Medicaid statute, § 1396a(a)(3), does not create a federal right enforceable under § 1983. Although couched in terms of sovereign immunity, the State's argument on

17

this score is entirely devoted to attacking the district court's ruling that Plaintiffs can state an actionable claim under § 1983 to enforce § 1396a(a)(3). Even more so than Defendants' constitutional contentions, this argument centers on the merits of Plaintiffs' § 1983 claim, not their use of Ex parte Young to seek injunctive relief despite the Eleventh Amendment. Moreover, other than their misinterpretation of Doe (which we exposed above), Defendants provide no support for the notion that, to determine the applicability of the Ex parte Young exception, we must review the district court's conclusion that a § 1983 action can be brought to enforce § 1396a(a)(3). On the contrary, at least one court of appeals has refused to broaden this type of interlocutory appeal to encompass the question whether alleged transgressions of the Medicaid statute can be vindicated under § 1983. See Rosie D. ex rel. John D. v. Swift, 310 F.3d 230, 233-34, 238 (1st Cir. 2002) (opining that the issue of enforceability under § 1983 was not ripe for review). Similarly, we will confine ourselves to the question whether Plaintiffs have properly demonstrated jurisdiction under Ex parte Young.

**D.  The applicability of the Ex parte Young exception to Eleventh Amendment immunity**

Left to address the simple question whether the district court correctly found that Plaintiffs properly have proceeded under Ex parte Young, we agree with the district court. Plaintiffs allege that Defendants' failure to admit them to the

18

HCS and CLASS programs violates § 1396a(a)(3), Title II, and § 504.  Further, they seek injunctive and declaratory relief.[10] Thus, the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon, 535 U.S. at 645 (internal quotation marks omitted). Plaintiffs have therefore satisfied the Supreme Court's "straightforward inquiry," and we hold that the Eleventh Amendment does not apply to this suit.  See P.R. Aqueduct & Sewer Auth., 506 U.S. at 146 ("Young and its progeny render the [Eleventh] Amendment wholly inapplicable to a certain class of suits.").

## V.  Conclusion

Accordingly, we AFFIRM the order of the district court denying that portion of Defendants' motion to dismiss that relies on the defense of Eleventh Amendment immunity.

---

[10]     Defendants do not contend that the relief sought by Plaintiffs could have an impermissibly retroactive effect.

19

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

The majority opinion incorrectly concludes that the constitutionality of the federal law underlying an *Ex parte Young* suit is not properly considered as part of an Eleventh Amendment immunity analysis. To sustain a *Young* suit a plaintiff must allege an ongoing violation of valid, constitutional federal law. As I believe that Title II of the ADA was enacted beyond Congress's legislative authority, I would hold that the plaintiffs in this case ("the Plaintiffs") have failed to establish a valid *Young* suit against the defendant commissioners ("Texas") under Title II of the Americans with Disabilities Act ("ADA") and that Texas is entitled to Eleventh Amendment immunity as to that claim. However, because I believe § 504 of the Rehabilitation Act is valid Spending Clause legislation, I would hold that the Plaintiffs have properly alleged a *Young* suit under that statute. Further, I agree with the majority opinion that Texas's claim that the Medicaid Act does not provide for an individual cause of action is beyond the scope of this appeal and should not be considered. Accordingly, I respectfully concur in part, and dissent in part.

I

This is an interlocutory appeal of an order denying Texas's claim of Eleventh Amendment immunity. *See Puerto Rico Aqueduct  &*

20

*Sewer Auth. v. Metcalf & Eddy Inc.*, 506 U.S. 139, 147, 113 S. Ct. 684 (1993) (authorizing an interlocutory appeal of an order denying Eleventh Amendment immunity).  As there is no final order in this case, we are limited to considering the question of whether Texas is entitled to Eleventh Amendment immunity from the Plaintiffs' suit.  All other issues are beyond the scope of this appeal.

As part of this appeal, Texas challenges the constitutionality of both Title II of the ADA and § 504 of the Rehabilitation Act.   Texas does not independently challenge the constitutionality of these statutes, which would be beyond the jurisdiction of this appeal.  Instead, it challenges their constitutionality as part of its assertion of Eleventh Amendment immunity and its argument that the Plaintiffs have not properly alleged a suit under *Ex parte Young*.  Texas argues that because the permissibility of a *Young* suit is premised on the assumption that the defendant state official is engaging in an ongoing violation of federal law, the question of the validity of that federal law is a proper subject of an Eleventh Amendment immunity analysis.  I agree.

Under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal court by [its] own citizens as well as by citizens of another state."  *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S. Ct. 1347 (1974).  The Eleventh Amendment

21

provides states with immunity from "the indignity" of being subjected to the "coercive process of judicial tribunals at the instance of private parties." *Metcalf*, 506 U.S. at 146 (citing *In re Ayer*, 123 U.S. 443, 505, 8 S. Ct. 164 (1887)). The Supreme Court has held that the rule that "a State may not be sued without its consent is [such] a fundamental rule of jurisprudence . . . that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given . . . ." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S. Ct. 900 (1984) (quoting *Ex parte State of New York No. 1*, 256 U.S. 490, 497, 41 S. Ct. 588 (1921)) (emphasis omitted). Eleventh Amendment immunity extends to suits against state officials in their official capacities. *See id.* at 101 (A suit against a state official "is in fact against the sovereign if the decree would operate against the latter."). Therefore, "a suit against [a] state official[] that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Id.* at 102.

One exception to this general rule is that "a suit challenging the constitutionality of a state official's action is not one against the State." *Id.; see Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908). Under *Ex parte Young*, "an unconstitutional enactment is 'void' and therefore does not

22

impart to the officer any immunity from responsibility to the supreme authority of the United States." *Pennhurst*, 465 U.S. at 102 (internal quotations omitted). The Supreme Court has recognized that there is some "irony" in the fact that "an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment" but does not under the Eleventh Amendment. *Id.* at 105. It, however, has concluded that the *Young* doctrine is "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Id.*

The Supreme Court, however, has sought to balance the need to hold state officials responsible to the "supreme authority of the United States" with states' "fundamental" right to immunity from private suit. To achieve this balance it has thus limited the scope of the *Young* exception. For example, a *Young* suit can only be brought to require a state official to "conform his future conduct of office to the requirements of" federal law, but may not be applied retroactively. *Edelman*, 415 U.S. at 664; *see Verizon Maryland Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, 122 S. Ct. 1753 (2002) (A *Young* suit requires the plaintiff allege "an ongoing violation of federal law and seek[] relief properly characterized as prospective.").

In crafting this limitation, the Supreme Court has noted that the "distinction between prospective and retroactive relief

23

fulfills the underlying purpose of *Ex parte Young* while at the same time preserving to an important degree the constitutional immunity of the States." *Pennhurst*, 465 U.S. at 106. Further, it has noted the importance of consciously balancing these two important interests when applying the *Young* doctrine. *See, e.g., id.; Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 270, 117 S. Ct. 2028 (1997) (noting that application of *Young* requires an "understanding of its role in our federal system"); *see also Verizon*, 535 U.S. at 649 (Kennedy, J., concurring) ("*Ex parte Young* jurisprudence requires careful consideration of the sovereign interests of the State as well as the obligations of state officials to respect the supremacy of federal law.").

In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court held that a plaintiff cannot vindicate state rights as part of a *Young* suit. *Pennhurst*, 465 U.S. at 106. After reviewing the policy justifications for the *Young* doctrine and noting the importance of balancing the competing interests outlined above, the Court concluded: "This need to reconcile competing interests is wholly absent, however, when a plaintiff alleges that a state official has violated state law. In such a case the entire basis for the doctrine of *Young* . . . disappears." *Id.* (emphasis omitted). It further concluded, "[a] federal court's grant of relief against state officials on the basis of state law . . . *does not vindicate the supreme authority*

24

*of federal law.*"  *Id.* (emphasis added)*; see Saahir v. Estelle*, 47 F.3d 758, 761 (5th Cir. 1995) (noting that "the only legitimate basis for federal court intervention, consistent with the Eleventh Amendment is the vindication of federal rights").

The Supreme Court has thus made it clear that if there are no federal rights for the plaintiff to vindicate then the justification for the *Young* exception is not present in the case and the state's right to Eleventh Amendment immunity should be honored.  *See Pennhurst*, 465 U.S. at 106.  The justification for a *Young* suit is also absent when the plaintiff alleges the ongoing violation of unconstitutional or otherwise invalid federal law.  In such a case, there are no federal rights to vindicate and there can be no prospective relief under *Young*. Therefore, before we can determine whether a plaintiff seeks to vindicate "the supreme authority of the law" and before we can possibly balance the "sovereign interests of the State . . . [with the] obligation[] of state officials to respect the supremacy of federal law," we must first determine whether the plaintiff seeks to vindicate *valid* federal rights, and by implication whether the federal law underlying the *Young* suit is constitutional.

The majority opinion concludes that if we were to address the constitutionality of the statutes underlying the Plaintiffs' *Young* suit we would be impermissibly addressing the merits of

their claims. The Supreme Court has specifically held that "the inquiry into whether a suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon,* 535 U.S. at 646, *see Couer d'Alene*, 521 U.S. at 281 ("An allegation of an ongoing violation of federal law . . . is ordinarily sufficient . . . .").

*Verizon*, however, does not address the relevance of the constitutionality of the federal law underlying the *Young* suit. In *Verizon*, the Maryland Public Service Commission ("the Commission") argued that it was not subject to discipline under the provisions of the federal statute (The Telecommunications Act of 1996) underlying Verizon's *Young* suit. *See Verizon*, 535 U.S. at 646. It did not argue that the law underlying the *Young* suit was unconstitutional or was otherwise not valid federal law. The Supreme Court held that the Commission had improperly argued the merits of the underlying claim))whether the Commission had violated the dictates of the Telecommunications Act))as part of its assertion of Eleventh Amendment immunity. *Id.* However, the proposed constitutional inquiry in this case is not a review of the merits of the Plaintiffs' substantive claims))whether Texas violated either Title II of the ADA or § 504 of the Rehabilitation Act. Rather, it is part of the inquiry into whether the Plaintiffs seeks to vindicate valid federal rights.

Further, the majority opinion fails to heed the Supreme

26

Court's warning not to be held captive to the "mechanics of . . . pleadings" and forget that our application of "the *Young* exception must reflect a proper understanding of [the doctrine's] role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." *Couer d'Alene*, 521 U.S. at 270. As the Court noted, to do so "would be to adhere to an empty formalism and to undermine the principle . . . that the Eleventh Amendment immunity represents a real limitation on a federal court's federal question jurisdiction." *Id.* In blindly applying *Verizon* to this case, the majority opinion ignores the policy justifications behind the *Young* exception and needlessly subjects Texas to a suit in federal court without first determining whether the Plaintiffs seek to vindicate valid federal rights.

Additionally, there is no reason to delay resolving these issues. The Supreme Court has emphasized the importance of quickly resolving Eleventh Amendment claims because "the value to the States of their Eleventh Amendment immunity . . . is for the most part lost as litigation proceeds past motion practice." *See Metcalf*, 506 U.S. at 145. This suggests that resolving the constitutionality of the federal law underlying the *Young* suit should be completed sooner rather than later. This is particularly true here because there is no policy reason for delaying the resolution of these issues. The constitutionality

27

of these statutes is a purely legal question that can be resolved without the aid of either discovery or trial. *Compare Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806 (1985) (authorizing interlocutory review of denials of qualified immunity because "[a]ll [the court] need determine is a question of law") *and Johnson v. Jones*, 515 U.S. 304, 317, 115 S. Ct. 2151 (1995) ("[I]mmunity appeals interfere less with the final judgment rule if they are limited to cases presenting neat abstract issues of law."), *with Metcalf*, 506 U.S. at 147 (holding that "factual complexities" provide no excuse for refusing to resolve a claim of Eleventh Amendment immunity).

Further, appellate courts routinely resolve constitutional issues in interlocutory appeals as part of determining whether Congress has validly abrogated states' Eleventh Amendment immunity pursuant to their authority under § 5 of the Fourteenth Amendment. *See e.g., Reickenbacker v. Foster*, 274 F.3d 974, 979 (5th Cir. 2001) (finding that Congress went beyond its § 5 powers by abrogating states' Eleventh Amendment immunity under Title II of the ADA). It is similarly appropriate to resolve these constitutional issues during this appeal.

The Government suggest that if we were to decide that the constitutionality of these statutes is properly part of an Eleventh Amendment immunity analysis we should remand to the district court so that it may consider and address these issues.

28

The Supreme Court, however, has held that an "Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar [] that it need not be raised in the trial court." *See Edelman*, 415 U.S. at 678 (ruling on an Eleventh Amendment immunity claim raised for the first time in the appellate court). Further, as these are purely legal questions which would be reviewed *de novo* in a future appeal there is no reason to remand for a ruling by the district court.

Accordingly, I would hold that a challenge to the constitutionality of a statute underlying a *Young* suit is a proper subject of an Eleventh Amendment immunity analysis and that consideration of such a challenge is within the scope of an interlocutory appeal from the denial of a claim of Eleventh Amendment immunity. Texas challenges the constitutionality of both Title II of the ADA and § 504 of the Rehabilitation Act. As I believe these constitutional challenge are within the scope of this appeal, I will address the merits of Texas's contentions.

II

Texas challenges the constitutionality of Title II of the ADA. It argues that Title II was enacted beyond the scope of Congress's authority under both § 5 of the Fourteenth Amendment and the Commerce Clause. *See* 42 U.S.C. § 12101(b)(4) (invoking both Congress's § 5 authority and Commerce Clause power in enacting the ADA). Texas also argues that Title II improperly

29

impedes on state authority in violation of the Tenth Amendment.

A

Texas first argues that we should extend our ruling in *Reickenbacker v. Foster*, 274 F.3d at 976 (holding that Title II of the ADA was enacted beyond Congress authority under § 5 for purposes of abrogating states Eleventh Amendment immunity), to this case and hold that Congress acted beyond its § 5 authority in enacting Title II. Plaintiffs and the Government argue that *Reickenbacker* is not controlling because in that case we did not engage in a full § 5 analysis. *See id.* at 982 n.60 (refusing to consider Congressional findings of discrimination by local entities in § 5 abrogation analysis because local entities cannot assert sovereign immunity). Further they argue that our decision in *Reickenbacker* has been, at least partially, superseded by the Supreme Court's recent decision in *Tennessee v. Lane*, 124 S. Ct. 1978, 1992 (2004) (finding that "extensive record of disability discrimination" by states justified "prophylactic legislation"), and argue that, in light of *Lane*, Title II's accommodation requirement is a "congruent and proportional" response to irrational discrimination against the disabled by state and local public entities.

By its own terms, *Reickenbacker* cannot simply be extended to this case. In *Reickenbacker*, we held that Title II of the ADA was enacted beyond the scope of Congress's § 5 powers for

30

purposes of abrogating states' Eleventh Amendment immunity. *See Reickenbacker*, 274 F.3d at 982-83 (finding that because Congress never established that states engaged in unconstitutional discrimination against the disabled Title II's "affirmative accommodation obligation on the part of public entities" was enacted beyond Congress's § 5 authority); *cf. Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367-68, 121 S. Ct. 955 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational.").

We, however, noted that "Title II of the ADA could still be a valid exercise of Congress's § 5 power, but simply not provide the . . . power to abrogate" states' Eleventh Amendment immunity. *See Reickenbacker*, 274 F.3d at 982 n.60. This limiting language was premised on our refusal to review Congressional findings as to discrimination by local entities as part of that § 5 analysis because local entities cannot claim Eleventh Amendment immunity. *See id.; see also Garrett*, 531 U.S. at 369 ("[Local] entities are subject to private claims for damages under the ADA without Congress ever having to rely on § 5 . . . . It would make no sense to consider constitutional violations on their part, as well as by the States themselves, when only the States are the beneficiaries of the Eleventh Amendment."); *but see Lane*, 124 S. Ct. at 1991 n.16 (suggesting that "constitutional violations on

31

the part of nonstate governmental actors" is "relevant" to this inquiry).  In contrast, "the analysis of whether Congress has the power to *enact* legislation requires [an] inquiry into constitutional violations by [local] entities in addition to entities entitled to Eleventh Amendment immunity." *Reickenbacker*, 274 F.3d at 982 n.60 (emphasis added) (quoting *Thompson v. Colorado*, 258 F.3d 1241, 1253 n.7 (10th Cir. 2001), *republished* at 278 F.3d 1020).  This inquiry was absent from *Reickenbacker* and must be included here to determine whether Title II is proper § 5 legislation.

Section 5 grants Congress the power "to enforce" the substantive guarantees of the Fourteenth Amendment through "appropriate legislation." *Garrett*, 531 U.S. at 365.  In exercising this power, Congress is not limited to remedying violations of the substantive rights guaranteed by the Fourteenth Amendment. *See Katzenbach v. Morgan*, 384 U.S. 641, 648-76, 86 S. Ct. 1717 (1966).  "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Garrett*, 531 U.S. at 365 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81, 120 S. Ct. 631 (2000)).  "In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in

32

order to prevent and deter unconstitutional conduct." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727-28, 123 S. Ct. 1972 (2003).

There are limits on Congress's power to pass prophylactic legislation. Congress may not pass prophylactic legislation that is in effect a "substantive redefinition of the Fourteenth Amendment right at issue." *Id.* at 728; *see City of Boerne v. Flores*, 521 U.S. 507, 519, 117 S. Ct 2157 (1997) ("Congress does not enforce a constitutional right by changing what the right is."). "Accordingly, § 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Garrett*, 531 U.S. at 365 (quoting *City of Boerne*, 521 U.S. at 520).

The first step in this analysis is to identify the scope of the constitutional right to be protected. *Id.* The Supreme Court has concluded that "classifications based on disability violate [the Fourteenth Amendment] if they lack a rational relationship to a legitimate governmental purpose." *Lane*, 124 S. Ct. at 1988; *see Garrett*, 531 U.S. at 367 ("States are not required . . . to make special accommodations for the disabled, so long as their actions toward such individuals are rational."). Congress thus may seek through its § 5 power to enforce a prohibition on "irrational disability discrimination." *Lane*, 124 S. Ct. at

33

1988.[11]

The next step is to determine "whether Congress identified a history and pattern of unconstitutional . . . discrimination by the States against the disabled." *Garrett*, 534 U.S. at 368. The Supreme Court, in *Tennessee v. Lane*, appears to have resolved this question. Relying almost exclusively on federal case law, the Court concluded that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs . . . ." *Lane*, 124 S. Ct. at 1989. It found in the case law examples of irrational discrimination by states against the disabled in the contexts of: voting; marriage; jury eligibility; state mental institutions; zoning decisions; public education; the penal system; and access to the judicial system. *Id.* at 1989.[12] The Supreme Court has thus concluded

---

[11] In contrast, a higher standard of review may apply when other types of classifications or rights are at issue. *See e.g.*, *Hibbs*, 538 U.S. at 728 ("[S]tatutory classifications that distinguish between males and females are subject to heightened scrutiny."); *Lane*, 124 S. Ct. at 1992 ("[R]ight to the access to the courts . . . call[s] for a standard of judicial review at least as searching . . . [as] the standard that applies in sex-based classifications.").

[12] The Supreme Court has in the past required that Congress *itself* identify a history and pattern of discrimination by states. *See Coll. Sav. Bank v. Florida Prepaid Post-secondary Edu. Expense Bd.*, 527 U.S. 666, 639, 119 S. Ct. 2219 (1999) ("[F]or Congress to invoke § 5, *it must identify* conduct transgressing the Fourteenth Amendment's substantive provisions.") (emphasis added); *see also*, *Garrett*, 531 U.S. at 370-72 (rejecting the use of documents that are not "legislative findings" to establish "adverse, disparate treatment by state officials."). In *Lane*, the Supreme Court appears to have

34

that the "inadequate provision of public services and access to public facilities [for the disabled are] appropriate subject[s] for prophylactic legislation."  *Id.* at 1992.

The final step in this analysis is to determine whether Title II is a congruent and proportional response to irrational discrimination by states against the disabled as identified in *Lane*.  *See Lane*, 124 S. Ct. at 1992 ("The only question that remains is whether Title II is an appropriate response to this history and pattern of unequal treatment."); *see City of Boerne,* 521 U.S. at 530.   In outlining this test, the Supreme Court has counseled: "The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."  *Id.* at 530.   To survive scrutiny, Title II must be tailored to remedy or prevent the "identi[fied] conduct transgressing the Fourteenth Amendment's substantive provisions."  *Coll. Sav. Bank  v. Florida Prepaid Post-secondary Edu. Expense Bd.*, 527 U.S. 666, 639, 119 S. Ct. 2219 (1999); *see City of Boerne*, 521 U.S. at 520 ("There must be a congruence and proportionality between *the injury to be prevented* or remedied and the means adopted to that end.") (emphasis added).

---

abandoned this requirement.  *See Lane*, 124 S. Ct. at 1999 (Rehnquist, J. dissenting) (noting that "the majority identifies nothing in the legislative record that shows Congress was responding to widespread violations of the . . . rights of disabled persons.").

The Supreme Court concedes in *Lane*, that taken as a whole, Title II may not be permissible § 5 legislation.  *See Lane*, 124 S. Ct. at 1992 ("[T]he fact that Title II applies not only to public education and voting-booth access but also to seating at state-owned hockey rinks indicates that Title II is not appropriately tailored to serve its objectives."); *but see id.* at 1992-3 (refusing to consider the constitutionality of Title II as a whole).  This conclusion is consistent with the Supreme Court's case law.  In finding that the Religious Freedom Restoration Act of 1993 was not permissible § 5 legislation the Supreme Court noted that the act's "[s]weeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description regardless of subject matter." *City of Boerne*, 521 U.S. at 532.  Title II's coverage is just as sweeping.  It regulates, by it own terms, "any State or local government; any department, agency, special purpose district, or other instrumentality of a State or local government." *See* 42 U.S.C. § 12131(1).  It regulates every state, every local government, and every state or local agency in the United States regardless of whether that entity (or one like it) has ever engaged in irrational disability discrimination.  Taken as a whole, there can be little doubt that "the accommodation obligation imposed by Title II . . . far exceeds that imposed by the Constitution" and is not a congruent and proportional

36

response to the findings of irrational discrimination by states as outlined in *Lane*.  *See Reickenbacker*, 274 F.3d at 983.

Ordinarily this would have been the end of the inquiry. Until *Lane*, the constitutionality of a statutory provision was considered as a whole.  *See e.g., Garrett*, 531 U.S. at 365-74 (applying § 5 analysis to Title I as a whole); *City of Boerne*, 521 U.S. at 529-36 (applying § 5 analysis to RFRA as a whole). However, in *Lane*, the Supreme Court took a different approach. While admitting that taken as a whole Title II may "not [be] appropriately tailored to serve its objectives," it concluded that as-applied in some circumstances Title II is appropriate § 5 legislation.  *See Lane*, 124 S. Ct. at 1992-93.  Specifically, it held that "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services."  *Id.* at 1993.  It then refused to address the application of Title II in any other circumstance.  *See id.*  The Supreme Court has thus structured a new test involving an "as-applied analysis" whereby courts do not evaluate the constitutionality of the statute as written, but instead  posit "a hypothetical statute . . . that applies only to" the relevant circumstance.  *See id.* at 1993 n.18 (holding that courts "need not examine the full breath of the statute at once"); *see also id.* at 2005 (Rehnquist J., dissenting) (acknowledging the change in approach).

As this is a brand new approach to considering the constitutionality of a statute there is a dearth of precedent on which to rely in considering how to apply this test.  However, *Lane* itself provides a roadmap for how to appropriately determine whether Title II, as-applied to the circumstances of this case, is appropriate § 5 legislation.  In *Lane*, the Court first referred back to its findings regarding "unequal treatment of disabled persons in the administration of judicial services." *Id.* at 1993.  It then concluded that Title II's requirement that states take "reasonable measures to remove architectural and other barriers to accessibility" is appropriate legislation because as-applied it is a congruent and proportional response to the Court's findings of irrational discrimination by states in the administration of judicial services.  *See id.* at 1993.  The Court thus identified the specific constitutional problem to be remedied (as evidenced by its findings) and then evaluated Title II as it regulates that specific problem.  *See id.* at 1994.

The Supreme Court identified eight general areas where there is a demonstrated history of irrational discrimination by states against the disabled: voting; marriage; jury eligibility; state mental institutions; zoning decisions; public education; the penal system; and access to the judicial system.  *See id.* at 1989.  The only one of these areas possibly applicable to this case is state mental institutions.  The Court found that there is

38

a "documented history" of unconstitutional discrimination by state agencies in the settings of "unjustified commitment" and "the abuse and neglect of disabled persons committed to state mental institutions." It documented this history by citing two of its cases: *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845 (1972), and *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452 (1982).

In *Jackson v. Indiana*, the petitioner, Theon Jackson, had been committed to a state mental institution for an indefinite period of time on account of his incompetency to stand trial for petty burglary. *Jackson*, 406 U.S. at 717-20. The trial judge ordered Jackson confined to a state mental institution until it was determined that he was competent to stand trial. *Id.* at 719. Based on the evaluation of Jackson by two physicians, he would likely never be competent to stand trial and would thus be confined to a mental institution for the rest of his life. *Id.* The Supreme Court held that Indiana violated Jackson's rights to equal protection and due process by condemning him to permanent institutionalization without the benefit of a civil commitment hearing applying the proper state standards governing forced institutionalization. *Id.* at 730-31. In making its ruling, the Court did not question the ability of states to order institutionalization or the normal process by which states determine whether an individual should be committed. *See id.* at

736 ("States have traditionally exercised broad power to commit persons found to be mentally ill."). Instead, it concluded that the method by which Jackson had been committed violated his constitutional rights.

In *Youngberg v. Romeo*, Nicolas Romeo, who was confined to a state mental institution pursuant to proper procedures, sued the state mental institution to recover damages for injuries caused by his own violent behavior and attacks from other residents of the facility. *Romeo*, 457 U.S. at 311. The Court considered the question of whether Romeo, as an "involuntarily committed retarded person," had a "constitutionally protected liberty interest in safety, freedom of movement and training within the institution." *Id.* at 314-15. It concluded that institutionalized persons like Romeo do have these constitutional rights and that states are obliged to protect them. *Id.* at 324 However, recognizing the difficulty of operating a state mental institution and balancing the protection of these rights with the orderly operation of such a facility, the Court concluded that the decisions of the professional personnel who operate these institutions "are entitled to a presumption of correctness." *Id.* While the Court delineated the rights possessed by institutionalized persons when they are in forced state custody, it did not reprimand the state mental institution for its decisions concerning the care of Romeo or other similarly

situated persons.

These two cases relate solely to the process by which a disabled person is committed to a state mental institution and the treatment of that person in such a facility once institutionalized. To the extent that Title II regulates the process by which disabled persons are institutionalized and their treatment in state mental institutions once they have been committed it may be a congruent and proportion response to the irrational discrimination highlighted in *Jackson* and *Romeo*.[13] Such an analysis must be left to another day because the defendant commissioners in this case neither run a state mental institution nor do they make decisions regarding forced institutionalization. They run Texas's Home and Community-based Waiver Services program which provides home and community based services for disabled individuals. The Plaintiffs seek to participate in this program, they do not seek to overturn a decision forcing their institutionalization nor do they seek to challenge the care they receive in a state mental institution.

Title II's regulation of Texas's decisions regarding participation in this program has nothing to do with either forced institutionalization or the treatment of disabled

---

[13] Title II, which regulates decisions regarding participation in state run services and programs, appears to regulate neither decisions regarding forced institutionalization or the care for disabled person in state mental institutions.

individuals who reside in state mental institutions.  Therefore, even under the broadest understanding of these terms, Title II, to the extent that it regulates Texas's decisions regarding participation in the Medicaid programs at issue in this case, cannot be considered to be a "congruent and proportional" response to the findings of irrational disability discrimination by states and local entities as outlined in *Lane*.

B

Texas next argues that because Title II does not regulate "economic activity"it is not a valid regulation of commerce under the Commerce Clause.  *See United States v. Morrison*, 529 U.S. 598, 613, 120 S. Ct. 1740 (2000) ("[C]ases have upheld Commerce Clause regulation of intrastate activity only where the activity is economic in nature."); *United States v. Lopez*, 514 U.S. 549, 559-60, 115 S. Ct. 1624 (1995).  Plaintiffs and the Government counter that because state entities, including the defendant agencies, covered by Title II engage in economic activity they can be regulated by the federal government, and that the economic activity of disabled individuals who are unable to access public services sufficiently impact interstate commerce to justify Congress's regulation.  Further the Government argues that even if Title II does not sufficiently regulate economic activity to be justified under the Commerce Clause, the ADA as a whole does and Title II is such an integral part of the ADA's permissible

42

regulation that Title II is itself constitutional. *See Hodel v. Indiana*, 452 U.S. 314, 329 n.17, 101 S. Ct. 2376 (1981); *see also Lopez*, 514 U.S. at 561; *Groome Resources Ltd v. Parish of Jefferson*, 243 F.3d 192, 210 (5th Cir. 2000).

"In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test . . . ." *Groome*, 234 F.3d at 203. Therefore, "we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607.

In *United States v. Lopez* and *United States v. Morrison* the Supreme Court outlined the framework for evaluating whether a federal law constitutes permissible Commerce Clause legislation.[14] There are three broad categories of activity that Congress may regulate under its commerce power: 1) channels of interstate commerce; 2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; 3) those activities having a substantial relation to interstate commerce, i.e. those activities that substantially affect interstate commerce. *Id.* at 609.

---

[14] In *Lopez*, the Supreme Court struck down the Gun-Free Zones Act of 1990 which criminalized the knowing possession of a firearm within a school zone. *Lopez*, 514 U.S. at 551. In *Morrison*, it struck down the Violence Against Women Act which provided civil remedies for victims of gender-motivated violence. *Morrison*, 529 U.S. at 601.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.  Like the statutes in both *Lopez* and *Morrison* Title II cannot be justified under either of the first two types of permissible Commerce Clause legislation because it solely regulates intrastate activity.  Plaintiffs and the Government instead rely on the argument that Title II regulates activity that "substantially affects interstate commerce."

The Supreme Court has outlined four factors to be taken into account when deciding whether Congress is regulating an activity that substantially affects interstate commerce: 1) whether the activity regulated is "economic [in] nature"; 2) whether the statute has an "express jurisdictional element" limiting its reach to activities with a connection to interstate commerce; 3) whether the statute's "legislative history contains express congressional findings regarding the effects upon interstate commerce"; and 4) whether the link between the regulated activity and interstate commerce are too attenuated to be considered a regulation of interstate commerce.  *Morrison*, 529 U.S. at 610-12 (restating the requirements outlined in *Lopez*); *see Groome*, 234 F.3d at 203-04 (recognizing the *Lopez-Morrison* framework).

44

The first factor is whether the regulated activity is economic in nature. "This query derives from the general *Lopez* requirement that the regulated intrastate activities, 'arise out of or are connected with a *commercial transaction*, which viewed in the aggregate, substantially affects interstate commerce.'" *Groome*, 234 F.3d at 205 (quoting *Lopez*, 514 U.S. at 561) (emphasis added). In *Morrison*, the Supreme Court specifically emphasized the importance of this factor in this framework. *See Morrison*, 529 U.S. at 610 ("[A] fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case.").

We have interpreted *Lopez* to define two types of economic activity: 1) activity that is in any sort of economic enterprise; and, 2) activity that exists as an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated. *See Groome*, 234 F.3d at 205 (citing *Lopez*, 514 U.S. at 561). Economic activity as defined by *Lopez* and understood by *Groome* requires a "commercial transaction," *see Lopez*, 514 U.S. at 561, or "commercial intercourse," *see Groome*, 234 F.3d at 206; *see also United States v. Ho*, 311 F.3d 589, 598-99 (5th Cir. 2002) (emphasizing that Congress may only regulate "commercial activity"). "It bears reminding that at issue is the power to regulate interstate *commerce*. In that sense commerce is 'the

exchange of goods and services' or 'trade and other business activities.'" *GDF Realty Investments Ltd v. Norton*, 326 F.3d 622, 629 (5th Cir. 2003) (quoting BLACK'S LAW DICTIONARY 263 (7th Ed. 1999)).

Texas argues that Title II does not regulate economic or commercial activity, rather, by its own terms, it regulates "participation in . . . services, programs, or activities of a public entity." *See* 42 U.S.C. § 12132. While admitting that states often engage in commercial activity both as an entity in the market and as a regulator, Texas argues that its decisions concerning who is eligible to participate in its programs and receive its entitlements do not constitute commercial activity as contemplated by *Lopez* and *Morrison*. These decisions do not involve "commercial transactions," *see Lopez*, 514 U.S. at 561, nor do they regulate "commercial intercourse," *see Groome*, 234 F.3d at 205-06 (finding that zoning decisions regulate "the commercial transaction[s] of purchasing a home and the commercial rental of housing").

Plaintiffs and the Government first claim that Title II is a regulation of an economic enterprise. They argue that public entities like the defendants engage in the commercial activity of hiring and paying staff, purchasing or renting facilities, and borrowing money. Although all of this is true, none of it is relevant. Texas does not challenge the provisions of the ADA

46

that regulate its commercial activity, namely Title I, which regulates its hiring practices. *See United States v. Mississippi Dep't of Public Safety*, 321 F.3d 495, 500-01 (5th Cir. 2003) (finding that employment is commerce, and that Title I is permissible commerce clause legislation as applied to states). It only challenges Title II, which regulates its decisions as to who receives the benefits of its social services. Title II does not regulate any of the activities highlighted by the Plaintiffs.

Further, if this argument was accepted there would be no limit on Congress's ability to regulate state entities. All state entities, including state legislatures and courts, hire and pay staff and engage in other commercial and economic activity such as purchasing goods and services. One would not conclude that Congress can therefore regulate all the activities of state legislatures and courts. Although, under the commerce clause, Congress may regulate state entities as they engage in commercial transactions, Congress does not have carte blanche authority to regulate state entities in all their activities))commercial or not))simply because these entities sometimes engage in commercial transactions. *See* discussion *infra*.

Plaintiffs next counter that Title II regulates economic activity because discrimination against disabled persons substantially affects those persons' commercial and economic

47

activities and the national economy.  Plaintiffs argue that when disabled individuals are denied access to public services it affects their ability to engage in economic activity which affects interstate commerce. This argument misreads *Lopez*.  The relevant question is not whether the regulated activity affects commerce, it is whether the regulated activity *is* commerce. *See Lopez*, 514 U.S. at 560-61; *GDF Realty*, 326 F.3d at 630 (noting that the key question is "whether the nature of the regulated activity is economic").  The "substantially affecting" language is only relevant once it is determined that economic activity is being regulated and the court must determine whether that *intra*state economic activity substantially affects *inter*state commerce.  *See Lopez*, 514 U.S. at 560 ("Where *economic activity* substantially affects *interstate commerce*, legislation regulating that activity will be sustained.") (emphasis added); *see also Morrison*, 529 U.S. at 613 ("[O]ur cases have upheld Commerce Clause regulation of *intrastate activity* only where that activity is *economic in nature*.") (emphasis added).  The substantially affecting test is inapplicable when determining whether the federal law regulates economic activity.

Moreover, in *Morrison,* the Supreme Court explicitly rejected this kind of reasoning.[15]  First noting that "Congress found that

_____

[15] We also explicitly rejected this reasoning in *United States v. Ho*.  *See Ho*, 311 F.3d at 599 ("[A]ny imaginable

48

gender-motivated violence *affects* interstate commerce," it rejected the use of "reasoning that . . . [employs] the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615. It noted that employment of this "reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.* Further it could "be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtably significant." *Id.* at 615-16. This is exactly what Congress seeks to do with Title II, namely regulate the traditional activities of states by linking their non-economic activities to some tangential effect they have on the national economy. This is not permitted under the Commerce Clause.

Finally, Plaintiffs point to this Court's decision in *Groome Resources v. Parish of Jefferson* as evidence that Congress can regulate discrimination by state entities against the disabled.

activity of mankind can affect the alertness, energy, and mood of human beings, which in turn can affect their productivity in the workplace, which when aggregated together could reduce national economic productivity. Such reasoning would eliminate any judicially enforceable limit on the Commerce Clause, thereby turning that clause into what it most certainly is not, a general police power.").

In *Groome*, we considered a commerce clause challenge to the application of § 3604(f)(3)(B) of the Fair Housing Amendments Act ("FHAA") to zoning decisions. This provision prohibits the refusal to make reasonable accommodations in rules or policies that prevent disabled persons from full and equal use of dwellings. *See* 42 U.S.C. § 3604(f)(3)(B). Plaintiffs, a local zoning board, challenged the constitutionality of the provision as applied to their zoning decisions. We held that FHAA's regulation of zoning decisions is a regulation of commerce because zoning decisions regulate the economic activity of purchasing a home or renting property. *See Groome*, 234 F.3d at 205-06. That is not the case here. The FHAA, as applied in *Groome*, applied to state commercial regulation. The zoning decisions in *Groome* were fundamentally commercial in nature because they regulated obviously commercial activity, namely "the commercial transaction of purchasing a home and the commercial renting of housing." *See id.* at 205. Thus, *Groome* stands solely for the proposition that Congress may regulate states' regulation of commercial activity under the Commerce Clause. *But see New York v. United States*, 505 U.S. 144, 166, 112 S. Ct. 2408 (1992) ("The allocation of power contained in the Commerce Clause . . . does not authorize Congress to regulate state governments' regulation of interstate commerce."). It does not stand for the proposition that it can regulate states' non-economic decisions

50

as those decisions are not by their nature commercial regulation.

The Government claims that Title II fits under the second category of economic regulation, non-economic regulation that is integral part of a permissible regulation of commerce. It argues that Title II is an integral part of the ADA's permissible regulation of economic activity. *See Hodel*, 452 U.S. at 329 n.17 ("[A] complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test."); *see also Lopez*, 514 U.S. at 561; *GDF Realty*, 326 F.3d at 633.

The Government argues that the ADA is a comprehensive economic regulation of the activities of the disabled in the national economy. It further argues that in providing Title II services states often compete with private entities in areas such as housing, education, transportation, communication and health services such that exempting the states from the ADA's prohibitions against disability discrimination would unduly burden private sector entities in relation to state agencies. This, it argues, would undermine the willingness of private entities to voluntarily engage in behavior benefitting disabled

51

persons.  Finally, it argues that allowing disability discrimination in the providing of public services perpetuates stereotypical attitudes about the disabled that will spill over into the private sector and undermine the effectiveness of both Title I and III.  These arguments fail.

Title I's regulation of employment discrimination is permissible Commerce Clause legislation, *see Mississippi Dep't of Public Safety*, 321 F.3d at 500-01 (finding that employment is commerce, and that Title I is permissible commerce clause legislation as applied to states). Title III does not apply to states, *see Bloom v. Bexar County, Texas*, 130 F.3d 722, 726-27 (5th Cir. 1997), and Congress specifically limited the application of Title III's regulation of privately owned places of public accommodation to those involved in commerce, *see* 42 U.S.C. § 12181; *cf. Spector v. Norwegian Cruise Line Ltd.*, 356 F.3d 641, 644 (5th Cir. 2004).  The ADA, considered as a whole, is reasonably considered permissible Commerce Clause legislation. However, Title II is not an integral or necessary part of the ADA's economic regulation. *See Lopez*, 514 U.S. at 561; *GDF Realty*, 326 F.3d at 631 (noting that Congressional regulation is permissible only if "failure to regulate the . . . activity could 'undercut' the entire scheme").

Title II regulates the provision of public services and more specifically states' decisions regarding who receives the

52

benefits of their public services.  State governments do not compete with private entities in the provision of these services.  For example, states do not compete with the private sector in the distribution of the free health care provided by the defendants.  Although low-cost health care providers and charities provide similar services to similar people, in no sense are states competing with these entities in the health care market.[16] States are simply providing a government created entitlement.  Therefore states' decisions in this realm cannot possibly competitively disadvantage private sector entities as they are not competing with states in any commercial market.   Regardless, private sector entities are bound by the requirements of the ADA whether they are competitively disadvantaged or not.  Even if states are not regulated by the ADA, all private entities are subject to its restrictions.  In fact, private entities are subject to broader restrictions than states because Title III applies exclusively to them. *See Bloom*, 130 F.3d at 726-27 (finding that Title III only applies to private entities).  Further, when states do directly compete with private entities in a market states are engaging in commercial activity that can be regulated under the Commerce Clause.  *See, e.g., Mississippi Dep't of Public Safety*, 321 F.3d at 500-01 (finding that Congress can regulate states as they act

---

[16] Nor would, for example, local police be in competition with a private security service, or a local fire department with a squad of volunteer firemen.

in the "national labor market"); *cf. Reno v. Condon*, 528 U.S. 141, 151, 120 S. Ct. 166 (2000) (finding that Congress can regulate states as "the owners of databases.").

Additionally, although the Government is correct that allowing discrimination against disabled individuals in the providing of public services helps entrench negative stereotypes against the disabled that may spill over into the private sector, Congress has passed laws forbidding such discrimination by private entities, including Title I and III of the ADA.[17] Further, although changing those negative stereotypes is a noble goal it is not in of itself economic or commercial regulation. Title II is not an integral part of the ADA's economic regulation of disability discrimination as Congress can achieve its permissible goals solely through the use of commercial regulation.

This is in contrast to the federal regulations in *Wickard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82 (1942). *Wickard* considered the application of restrictions on production of wheat to a farmer growing wheat for personal use. The Supreme Court noted in *Lopez* that although *Wickard* was not engaging in economic

---

[17] States, like Texas, have also passed such laws. *See e.g.* TEX. LAB. CODE. § 21.051 (forbidding employment discrimination based on disability); TEX. PROP. CODE § 301.025 (forbidding discrimination based on disability in sale or rental of property); TEX HEALTH & SAFETY CODE §§ 592.015, 592.016 (forbidding discrimination against mentally retarded individuals in both employment and housing).

activity, the purpose of Congress's legislation was economic in nature, namely to regulate the price of wheat. *See Lopez*, 514 U.S. at 560. Restricting Wickard's non-economic production and personal consumption of wheat was necessary to achieve Congress's economic goal of propping up the price of wheat. *See Wickard*, 317 U.S. at 128 (finding that widespread "home-consumed wheat would have a substantial influence on price and market conditions"). That is not the case here, Congress's permissible economic purposes, namely regulating discrimination in interstate commerce, can be achieved solely through prohibitions on discrimination by entities (including states) engaged in commercial activity.

"[B]y its terms [Title II] has nothing to do with 'commerce' or any sort of economic enterprise," nor is it "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *See Lopez*, 514 U.S. at 561.

The second factor is whether the regulated activity has an express jurisdictional element limiting its reach to activities with a connection to interstate commerce. The parties agree that there is no such jurisdictional element in Title II. Plaintiffs and the Government argue that this is not particularly telling because Title II so clearly regulates interstate commerce. As discussed above, this is not correct. Congress made no explicit

55

restriction on Title II's applicability to services and benefits that are economic in nature and substantially affect interstate commerce.[18]

The third factor is whether the legislative history contains *express* congressional findings regarding the regulated activities effects upon interstate commerce. Both Plaintiffs and the Government cite to ample congressional findings indicating that the purpose of the ADA is to regulate interstate commerce. They also cite to findings that disability discrimination leads to "unnecessary expenses resulting from dependency and non-productivity." *See* 42 U.S.C. § 12101(a)(9). However, as Texas points out, they cite to no Congressional findings that connect disability discrimination in the providing of social services to interstate commerce. In fact, the findings they cite relate to employment discrimination. *See, e.g.*, S. Rep. No. 101-116, at 17 (reprinted in 1990 U.S.C.C.A.N. 267, 325-26) ("Certainly, the elimination of *employment discrimination* and the main streaming of persons with disabilities will result in more persons with disabilities working . . . .") (emphasis added).

Considering most of the ADA, as a general proposition, regulates commerce, congressional findings that the ADA's general purpose is to regulate commerce are not terribly helpful, and

---

[18] In contrast, Congress did limit the applicability of Title III's regulation of public accommodations to those involved in commerce. *See* 42 U.S.C. § 12181.

findings related to employment discrimination are wholly irrelevant. Although it would be too much to say that Congress made no relevant findings that can be interpreted as connecting Title II to interstate commerce, it is safe to say that Plaintiffs and the Government have highlighted no "legislative history contain[ing] *express* congressional findings regarding [Title II's] effects upon interstate commerce." *See Morrison*, 529 U.S. at 612 (emphasis added). The Supreme Court emphasized the need for express findings because the purpose of reviewing these findings is to "enable us to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye." *Morrison*, 529 U.S. at 612. Plaintiffs and the Government highlight no findings that negate the obvious, that Title II does not regulate economic activity.

The fourth and final factor is whether the link between the regulated activity and interstate commerce is too attenuated to be considered a regulation of interstate commerce. This factor relates to whether the regulated economic activity substantially affects interstate commerce and is only applicable if Congress is regulating economic activity. The Supreme Court did not apply this factor when striking down the statutes in *Lopez* and *Morrison* and it is also inapplicable in this case.

Title II of the ADA is not permissible Commerce Clause

57

legislation to the extent that it regulates states' decisions regarding who will participate in or receive the benefits of state entitlement programs.

C

I do not believe that Congress acted within its powers under the Commerce Clause in enacting Title II of the ADA.  I further do not believe that it acted within its authority under § 5 of the Fourteenth Amendment as applied in this case. Consequently, I do not believe that Title II is valid federal law to the extent that it regulates Texas's decisions regarding participation in the programs at issue in this case, and I do not believe that Plaintiffs have alleged a continuing violation of valid federal law.[19]   Thus, I would reverse the district court's ruling as to Title II and hold that Texas has Eleventh Amendment immunity from Plaintiffs' Title II claim.

III

Texas asserts that § 504 of the Rehabilitation Act is invalid Spending Clause legislation.[20]  It argues that because

---

[19] Because I find that Title II was enacted beyond Congress's legislative authority I do not consider Texas's contention that it violates the Tenth Amendment.

[20] Whether Texas may have already waived its sovereign immunity to suit under § 504, or whether Congress may have already abrogated it under its § 5 authority are both questions presently being considered by this Court *en banc*.  *See Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609 (5th Cir. 2003), reh'g granted en banc, 339 F.3d 348 (5th Cir. 2003); *Johnson v. Louisiana Dep't of Educ.*, 330 F.3d 362 (5th Cir. 2003),  reh'g

58

conditions on federal funding must be "related" to the funding received by  states Congress cannot broadly place conditions on all federal funding accepted by states; it must instead directly tie its conditions to the specific funding received by the state. Texas thus argues that because it "receive[s] no § 504 funding"[21] its receipt of federal Medicaid funding cannot constitutionally be conditioned by § 504.  I disagree.

Under the Spending Clause, "Congress may attach conditions on the receipt of federal funds . . .[and may] condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."  *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S. Ct. 2793 (1987).  Congress may condition the receipt of federal monies if the conditions: 1) are in "the general welfare"; 2) were "unambiguously"communicated such that "the States [are] . . . cognizant of the consequences of" receiving the federal funding; 3) are *related* "to the federal interest in particular national projects or programs"; and, 4)

---

granted en banc, 343 F.3d 732 (5th Cir. 2003); *Miller v. Texas Tech*, 330 F.3d 691 (5th Cir 2003), reh'g granted en banc, 342 F.3d 563 (5th Cir. 2003).  I do not express an opinion on these questions.  Assuming that Texas has either waived its immunity or Congress has abrogated it, this challenge to the constitutionality of § 504 is beyond the scope of our jurisdiction in this appeal. *See* discussion *supra*.  However, as these questions are as of yet unresolved by this Court and as I believe Texas's constitutional challenge fails, I will address the merits of its argument.

[21] More accurately, Texas receives no funding under the Rehabilitation Act.

59

are not otherwise barred by the Constitution. *Id.* at 207-08.

Section 504 of the Rehabilitation Act provides that: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). It specifically applies to state entities that receive federal funding. *See* 29 U.S.C. § 794(b)(1).

Texas concedes receiving federal financial assistance under the Medicaid Act to operate the state programs at issue in this case. It also implicitly concedes that it was aware of § 504 and its restrictions at all times it was receiving federal monies. Therefore, Texas does not argue that it was unaware that its receipt of federal money was governed by § 504, rather it argues that because the restrictions were not specifically tied to its Medicaid funding they were not part of its "contract" with the federal government. *See Barnes v. Gorman*, 536 U.S. 181, 186, 122 S. Ct. 2097 (2002) (comparing Congress's conditions on the receipt of federal money to a "contract" between the states and the federal government).

Texas incorrectly concludes that Congress may not generally condition the receipt of federal monies. Title VI of the Civil Rights Act of 1964, using language almost identical to that found

60

in § 504, requires that no person on the basis of "race, color, or national origin [shall] be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d; *see Barnes*, 536 U.S. at 186 (noting the Title VI and § 504 are "coextensive").  The Supreme Court has already held that Title VI is valid Spending Clause legislation.  *See Guardians Ass'n v. Civil Service Comm'n of City of New York*, 463 U.S. 582, 598-99, 103 S. Ct. 3221 (1983) ("I note first that Title VI is spending-power legislation.").  The Court reasoned that the conditions in Title VI were like any other conditions Congress could have made on the receipt of federal money.  *See id.* at 599 ("Title VI imposes no obligations but simply extends an option that potential recipients are free to accept or reject.") (internal quotations omitted).  It did not appear to see a distinction between conditions specific to a particular allocation of federal money and those generally applicable to all federal monies available to states. *See id.*  In fact, it concluded that Congress's purposes in enacting Title VI were related to the spending it provided.  *See id.* ("Title VI rests on the principle that taxpayers' money, which is collected without discrimination, shall be spent without discrimination.").

It is no different with § 504.  In § 504, Congress connects its funding of state-run programs with its prohibition on

61

discrimination regarding participation in those programs. Congress does not seek to generally regulate the activities of the recipient state entities, or to regulate their activities unrelated to the use of federal funds. Instead, Congress seeks to control how the federal monies it provides are spent. Specifically, it seeks to ensure that the federal monies are not used to fund state programs that discriminate against the disabled. Congress's purpose and its conditions on the receipt of federal money are directly related. The fact that Congress sought to efficiently apply these conditions to all federal funding in one legislative act rather than in multiple ones has no effect on the constitutionality of its restrictions.

Section 504 of the Rehabilitation Act is valid Spending Clause legislation. Consequently, the Plaintiffs seek to vindicate valid federal rights and have alleged an ongoing violation of valid federal law under *Ex parte Young*. I would therefore affirm the district court's ruling denying Texas's claim of Eleventh Amendment immunity.

IV

Texas argues that Plaintiffs cannot bring a *Young* suit under the Medicaid Act because the act does not provide an individual right of action. *See Gonzaga v. Dole*, 536 U.S. 273, 282, 122 S. Ct. 2268 (2002) ("[A] plaintiff must assert the violation of a federal right, not merely a violation of federal law."); *Blessing*

*v. Freestone*, 520 U.S. 329, 340, 117 S. Ct. 1353 (1997). And further contends that because the statute provides no cause of action the Plaintiffs have not properly alleged a *Young* suit.

Texas does not challenge the constitutionality of the Medicaid Act or its status as valid federal law. Instead Texas questions whether Congress has provided a means of seeking redress for violations of the act through private causes of action in federal courts. The question of whether Congress created such a cause of action goes beyond the "inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *See Verizon*, 535 U.S. at 645. Texas does not challenge Congress's authority to create such a cause of action, but only questions whether Congress exercised that authority with respect to the Medicaid Act. Texas's contention therefore does not address the balance between the supremacy of federal law and states' right to immunity from suit. Rather, it assumes the validity of the federal law underlying the Plaintiff's *Young* suit and questions whether federal courts, as a function of federal statutory law, can provide relief. This is a merits question that is beyond the scope of this appeal. *See id.* at 646.

V

To sustain a *Young* suit a plaintiff must seek to "vindicate the supreme authority of federal law." Therefore, the

63

constitutionality of the federal law underlying a plaintiff's *Young* suit is properly considered as part of an interlocutory review of a district court's refusal to grant a state Eleventh Amendment immunity. Title II, as a whole, is impermissible Commerce Clause legislation. It is also impermissible § 5 legislation as-applied to this case. Therefore, I do not believe that the Plaintiffs *Young* suit under Title II can be sustained and Texas is entitled to Eleventh Amendment immunity. I, however, believe that the Rehabilitation Act is valid spending clause legislation and that the Plaintiffs *Young* suit under this statue is proper. Finally, I believe that Texas's contention that the Medicaid Act does not provide an individual cause of action is beyond the scope of this appeal. I thus concur in part, and dissent in part.